**LOCAL 478 TRUCKING and ALLIED IN-DUSTRIES PENSION FUND, Francis Prainito, Donald Paolella, Daniel McFall, Robert Kortenhaus, Andy Threatt and Louis Salz, as Trustees of Local 478 Trucking and Allied Industries Pension Fund, Plaintiffs,**

v.

**Willard D. JAYNE, Douglas W. Jayne, Gary J. Jayne, Elizabethport Realty Co., A Partnership and any and all members of trades or businesses under common control (excluding Jayne's Motor Freight, Inc.), Defendants.**

Civ.A. No. 91–1901(AJL).

United States District Court,
D. New Jersey.

Oct. 18, 1991.

As Corrected Nov. 27, 1991.

John E. Krampf, Michael L. Banks, Catherine Reid, Morgan, Lewis & Bockius, Philadelphia, Pa., Victor Parsonnet, Reitman, Parsonnet & Duggan, Newark, N.J., for plaintiffs.

George A. Spadoro, Bruce D. Ettman, Spadoro & Hilson, Woodbridge, N.J., for defendants.

## CORRECTED OPINION

LECHNER, District Judge.

This is an action brought by plaintiffs Local 478 Trucking and Allied Industries Pension Fund ("Fund"), and Francis Prainito, Donald Paolella, Daniel McFall, Robert Kortenhaus, Andy Threatt and Louis Salz as trustees (the "Trustees") of the Fund (collectively, the "Plaintiffs") against defendants Willard D. Jayne ("Willard Jayne"), Douglas W. Jayne ("Douglas Jayne"), Gary J. Jayne ("Gary Jayne") (collectively, the "Individual Defendants"), Elizabethport Realty Company ("Elizabethport") and Bro–Jen[1] ("Bro–Jen") (collectively, the "Partnership Defendants," with the Individual Defendants, collectively, the "Defendants"). Because Douglas Jayne is undergoing personal bankruptcy proceedings, Plaintiffs have specifically excluded Douglas Jayne individually from this motion for summary judgment. Pls.' Br. at 19 n. 10; see also Defs.' Br. at 2 n. 1.

Plaintiffs commenced this action to compel Defendants to make payments to the Fund for the withdrawal liability of Jayne's Motor Freight ("Jayne's Motor Freight") under a retirement welfare benefit plan (the "Plan") established pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiffs seek the amount of withdrawal liability and other relief authorized by ERISA, including interest, liquidated damages, attorneys' fees and costs.

Plaintiffs' complaint (the "Complaint") was originally filed 27 June 1990 in the United States District Court for the Eastern District of Pennsylvania. On 26 March 1991, this case was transferred to the District of New Jersey pursuant to the order of Herbert J. Hutton, United States District Judge. Jurisdiction is alleged pursuant to 29 U.S.C. §§ 1132(a)(3)(B), (d)(1), (e) and (f) and 1451(a)(1), (b) and (c) and 28 U.S.C. § 1331 and appears to be appropriate.

Currently before the court are a motion and cross-motion for summary judgment pursuant to Fed.R.Civ.P. 56.[2] These mo-

---

1. Rule 21 of the Federal Rules of Civil Procedure provides that: "Parties may be dropped or added by order of the court on motion of any party *or of its own initiative* at any stage of the action and on such terms as are just." Fed. R.Civ.P. 21; *see also Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 832–38, 109 S.Ct. 2218, 2222–26, 104 L.Ed.2d 893 (1989). Bro–Jen was not specifically named as a defendant in the Complaint and the parties did not formally move to add Bro–Jen as a defendant. The interests of justice, however, require that Bro–Jen be added as a defendant in this litigation.

 Plaintiffs did not specifically name Bro–Jen as a defendant in their Complaint because they were not aware of its existence at the time of filing. Bro–Jen was generally named in the Complaint as part of "Any and all members of any groups or businesses under common control" with Jayne's Motor Freight. Pls.' Br. at 6 n. 3. Defendants conceded at oral argument that Bro–Jen received adequate notice of, participated in and defended against this motion. As well, at oral argument counsel to Defendants agreed Bro–Jen should be deemed a party to this litigation. *See* n. 21, *infra.* Accordingly, Bro–Jen is a party in this action.

2. Plaintiffs have submitted the following for consideration: Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Br."); Plaintiffs' Memorandum of Law in Opposition to Defendants' Cross–Motion for Summary Judgment and Cross–Motion for Stay and Reply Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Reply Br."); Plaintiffs' Motion for Summary Judgment ("Pls.' Motion for Summ. J."); Affidavit of Frank M. Vaccaro ("Vaccaro Aff."); Plaintiffs' Interrogatories Propounded to Defendant Willard D. Jayne ("First Set"); Plaintiffs' Oral Deposition of Gary Jayne; Plaintiffs' Statement Pursuant to Rule 12(G) of Material Undisputed Facts; Plaintiffs' Objections to Defendants' Request to Reopen and to Take Further Discovery ("Pls.' Objections to Defs.' Req. to Reopen and to Take Further Disc.").

 Defendants have submitted the following: Memorandum of Law of the Defendants in Opposition to the Plaintiffs' Motion for Summary Judgment, in Support of their Cross–Motion for Summary Judgment and in Support of their Cross–Motion for a Stay of this Litigation ("Defs.' Br."); Memorandum of Law of the Defendants in Reply to the Plaintiffs' Opposition to the Defendants' Motion for a Summary Judgment and the Defendants' Motion for a Stay of these Proceedings ("Defs.' Reply Br."); Affidavit of Douglas W. Jayne (dated 27 June 91) ("D. Jayne First Aff."); Affidavit of Douglas W. Jayne (dated 5 July 91) ("D. Jayne Second Aff."); Affidavit of Frank M. Leonard; Affidavit of Robert B. Wasserman ("Wasserman Aff."); Affidavit of Willard D. Jayne ("W. Jayne Aff."); Affidavit of Gary J. Jayne ("G. Jayne Aff."); Defendants' Statement Pursuant to Rule 12(G) of Material Facts as to Which There is No Dis-

tions were filed and pending before Judge Hutton for some time before transfer to this District. Also before this court is a cross-motion to stay this litigation pending resolution of bankruptcy proceedings for Jayne's Motor Freight. For the reasons set forth below, summary judgment against Willard Jayne, Gary Jayne, Elizabethport and Bro–Jen is granted in favor of Plaintiffs. Defendants' cross-motions for summary judgment and stay of litigation are denied.

### Facts

Jayne's Motor Freight was a trucking company incorporated in the State of New Jersey. W. Jayne Aff., ¶ 6. Willard Jayne, Douglas Jayne and Gary Jayne are shareholders of Jayne's Motor Freight and co-partners of other family businesses including two partnerships, Elizabethport and Bro–Jen.

Elizabethport is a New Jersey real estate partnership formed in June 1986. *Id.,* ¶ 3; D. Jayne First Aff., ¶ 6; G. Jayne Aff., ¶ 3. Elizabethport owns and leases property located at 860 North Avenue, Elizabeth, New Jersey (the "Elizabeth Property"), where Jayne's Motor Freight was a tenant.[3] W. Jayne Aff., ¶ 3; D. Jayne First Aff., ¶¶ 5, 6; G. Jayne Aff., ¶ 3. Bro–Jen is another

New Jersey real estate partnership also formed in June 1986. W. Jayne Aff., ¶ 4; D. Jayne First Aff., ¶ 7; G. Jayne Aff., ¶ 4. Bro–Jen does not engage in any other business except owning and leasing one parcel of real property located in Southampton Township, New Jersey (the "Southampton Property"). W. Jayne Aff., ¶ 5; D. Jayne First Aff., ¶ 7; G. Jayne Aff., ¶ 4.[4]

Between 1957 and October 1988, Jayne's Motor Freight maintained the Plan which provides retirement income to qualified employees. The Fund had collected and held contributions from Jayne's Motor Freight in trust for the employees of Jayne's Motor Freight (the "Employees") and had been disbursing the contributions in monthly pension benefits to the Employees upon their attaining a specified retirement age.[5] Vaccaro Aff., ¶¶ 4, 8. The Fund is managed by the Trustees who were appointed in equal numbers by Jayne's Motor Freight and Local 478, the union representing the Employees (the "Union"). The Union is the certified and exclusive bargaining representative of the Employees who are participants in the Fund. *Id.,* ¶ 6.

Jayne's Motor Freight suffered financial problems and on or about October 1987, Willard Jayne and Douglas Jayne retained Robert Wasserman, Esq. ("Wasserman"),

---

pute ("Defs.' Statement"); Affidavit of George Spadoro ("Spadoro Aff."); Defendants' Request to Reopen and to Take Further Discovery ("Defs.' Req. to Reopen and Take Further Disc.").

**3.** Jayne's Motor Freight was not the exclusive tenant at the Elizabeth Property. Various entities, most of them not owned, in whole or in part, by a member of the Jayne family, also leased space at the Elizabeth Property. Defs.' Statement, ¶ A(4).

**4.** Willard Jayne and his brother, William Jayne ("William Jayne"), also owned various other enterprises unrelated to this action, including Port Elizabeth Realty Corporation ("Port Elizabeth"). Port Elizabeth was a New Jersey corporation whose holdings included the Elizabeth Property. Defs.' Statement, ¶ A(5).

On or about December 1977, Willard Jayne and William Jayne entered into an agreement (the "1977 Agreement") to divide their corporate holdings, excluding Port Elizabeth. *Id.,* ¶ A(6). Pursuant to the 1977 Agreement, William Jayne and his wife, Virginia Jayne, delivered all the stock they owned in Jayne's Motor Freight. These stocks were canceled and Willard Jayne

became the controlling shareholder of Jayne's Motor Freight.

Willard Jayne and William Jayne engaged in a family dispute leading to civil litigation. In December 1985, Willard Jayne and William Jayne executed a Stipulation ("1985 Stipulation") settling the civil litigation. *Id.,* ¶ A(8). The terms of the 1985 Stipulation required the real property owned by Port Elizabeth to be equitably divided between Willard Jayne and William Jayne. *Id.* Willard Jayne and his wife, Josephine Jayne, were required by the 1985 Stipulation to redeem their shares of stock in Port Elizabeth. In return, Port Elizabeth conveyed to Willard Jayne several parcels of real estate including the Elizabeth Property and the Southampton Property. *Id.,* ¶ A(9).

On 3 June 1986, Willard Jayne conveyed the Elizabeth Property to Elizabethport and the Southampton Property to Bro–Jen. *Id.,* ¶¶ A(10)–(11).

**5.** Retirees or pensioners from Jayne's Motor Freight receive pension amounts specified by a collective bargaining agreement known as the plan documents ("Plan Documents"). 29 U.S.C. § 1002(2) and (3).

to represent Jayne's Motor Freight in bankruptcy proceedings. W. Jayne Aff., ¶ 15; D. Jayne First Aff., ¶ 8. Gary Jayne, the other shareholder of Jayne's Motor Freight, had, by the time of the bankruptcy filing, resigned any office or directorship in Jayne's Motor Freight and did not participate in the management of Jayne's Motor Freight, including the decision to file for bankruptcy. G. Jayne Aff., ¶¶ 5, 6. On 14 October 1987, Wasserman filed a voluntary bankruptcy petition under 11 U.S.C. § 301 for Jayne's Motor Freight in the U.S. Bankruptcy Court for the District of New Jersey ("Chapter 11 Bankruptcy"). Wasserman Aff., ¶ 4; W. Jayne Aff., ¶ 16.

Wasserman was retained solely to represent Jayne's Motor Freight in the bankruptcy proceedings and was not retained to represent Elizabethport or Bro–Jen in any matter. G. Jayne Aff., ¶¶ 6, 8–9. Wasserman also did not represent Gary Jayne, Douglas Jayne or Willard Jayne in any other proceeding or matter. *Id.;* D. Jayne First Aff., ¶ 10; W. Jayne Aff., ¶ 18.

The Fund owned a security interest in assets belonging to Jayne's Motor Freight. At the time of the Chapter 11 Bankruptcy, the assets of Jayne's Motor Freight consisted primarily of tractors and trailers (the "Assets"). G. Jayne Aff., ¶ 12. Pursuant to an Order of United States Bankruptcy Judge Daniel Moore, dated 30 December 1987, the Fund enforced the security interest it had against the Assets. Wasserman Aff., ¶ 6. The Fund, however, delayed in removing the Assets, apparently depriving

Elizabethport rentable space at the Elizabeth Property. G. Jayne Aff., ¶ 12.

On 29 January 1988, the Chapter 11 Bankruptcy was converted into a Chapter 7 liquidation proceeding ("Chapter 7 Bankruptcy"). 11 U.S.C. § 1112. Wasserman Aff., ¶ 4; W. Jayne Aff., ¶ 16. Robert Levitt, Esq. ("Levitt"), was appointed Trustee in Bankruptcy. Wasserman Aff., ¶ 7. After the conversion, Wasserman's role was limited to reviewing and evaluating Levitt's requests with respect to the Chapter 7 Bankruptcy. *Id.,* ¶ 5.

According to the submissions, on 17 October 1988, Jayne's Motor Freight ceased contributing to the Fund, ceased "covered operations" under the Fund and completely withdrew from the Fund. Vaccaro Aff., ¶ 8. According to the Fund, the withdrawal of Jayne's Motor Freight from the Plan subjected it to withdrawal liability under 29 U.S.C. § 1381(a). *Id.,* ¶ 7.

Proceeding under the ERISA scheme pertaining to employers who cease contributions to pension plans, the Fund calculated the amount of withdrawal liability owed by Jayne's Motor Freight. *Id.,* ¶ 9. The Fund's actuaries calculated the initial amount to be $1,483,628.00.[6] *Id.,* This represented the proportionate share of unfunded vested liabilities owed by Jayne's Motor Freight. *Id.* After applying the *de minimis* reduction provisions of ERISA, 29 U.S.C. § 1389, the amount was later recalculated by the actuaries to be $1,390,077.00. *Id.*

The Fund's contract administrator, Frank M. Vaccaro ("Vaccaro"), sent a let-

---

**6.** The initial withdrawal liability amount was calculated:

> [B]ased on the formula described in Section 4211(b) of the Act and [the Fund's] records reflecting that [Jayne's Motor Freight] was obligated to contribute $574,792 to the Plan for the five Plan fiscal years ended August 31, 1980, $630,631 for the five Plan fiscal years ended August 31, 1981, $701,930 for the five Plan fiscal years ended August 31, 1982, $741,530 for the five Plan fiscal years ended August 31, 1983, $814,082 for the five Plan fiscal years ended August 31, 1984, $928,318 for the five Plan fiscal years ended August 31, 1985, and $1,022,280 for the five Plan fiscal years ended August 31, 1986. . . . This liability [was] comprised of the "Pre–September 26,

> 1980 Liability" which is based on unfunded vested liability as of August 31, 1980 and a "Post–September 26, 1980 Liability" based on the changed in unfunded vested liabilities between August 31, 1980 and August 31, 1981, between August 31, 1981 and August 31, 1982, between August 31, 1982 and August 31, 1983, between August 31, 1983 and August 31, 1984, between August 31, 1984 and August 31, 1985, and between August 31, 1985 and August 31, 1986.

> Letter to Jayne's Motor Freight from Frank M. Vaccaro, dated 17 November 1988 att. as Ex. A to Pls.' Motion for Summ.J. The above calculations did not include application of the *de minimis* reduction required by ERISA 29 U.S.C. § 1389.

ter (the "Demand Letter") to Jayne's Motor Freight via registered mail on 17 November 1988 to inform Jayne's Motor Freight of the withdrawal liability. The Demand Letter stated the Fund had assessed a withdrawal liability of $1,483,628.00 against Jayne's Motor Freight, subject to *de minimis* reductions. Demand Letter, ¶ 2. In the Demand Letter, quarterly payments of $73,559.00 were demanded beginning 17 January 1989.[7] *Id.* To date, no withdrawal liability payments have been made. Vaccaro Aff., ¶ 7.

Although addressed to Jayne's Motor Freight at its business address at the Elizabeth Property, the Demand Letter was rerouted and received by Levitt. D. Jayne Second Aff., ¶ 2. The parties disagree over how the letter was rerouted. *Id.* Plaintiffs contend they sent the Demand Letter to Jayne's Motor Freight at the Elizabeth Property. Pls.' Reply Br. at 4. According to Plaintiffs, sometime after Vaccaro had placed the Demand Letter in the mail, a sticker was placed over the Elizabeth Property address, redirecting the Demand Letter to Levitt. *Id.* Plaintiffs surmise that either the Post Office or Douglas Jayne may have redirected the Demand Letter. *Id.* at 4-5.

Douglas Jayne "strenuously and categorically" denied having redirected the letter. D. Jayne Second Aff., ¶¶ 2, 3. Douglas Jayne leases an office at the Elizabeth Property. D. Jayne First Aff., ¶ 22. In the past, Douglas Jayne received mail on behalf of Jayne's Motor Freight at the Elizabeth Property and currently continues to do so. *Id.*, ¶¶ 22, 24. According to Douglas Jayne, he has been at the Elizabeth Property daily, except for weekends, holidays and vacations, since 1978. *Id.*, ¶ 22. Douglas Jayne contends he would have received the Demand Letter had it been sent to the Elizabeth Property address. D. Jayne Second Aff., ¶¶ 4, 5.

After receiving the Demand Letter, Levitt wrote to Vaccaro on 23 November 1988 informing him "to the extent your letter asserts a claim against the Estate [Jayne's Motor Freight], you should have filed a Proof of Claim...." Letter to Vaccaro from Levitt, dated 23 November 1988. The following day, Levitt forwarded to Wasserman a copy of the Demand Letter and a copy of his letter to Vaccaro. Wasserman Aff., ¶ 7. On 23 February 1989, the Fund filed an amended proof of claim ("Proof of Claim") in the Chapter 7 Bankruptcy for $1,390,077.00, the amount of withdrawal liability which the Fund alleges Jayne's Motor Freight owed to the Fund. Proof of Claim att. as Ex. A to Pls.' Reply Br.

Upon receiving a copy of the Demand Letter, Wasserman filed the Demand letter and did nothing with it. Wasserman Aff., ¶ 7. Wasserman did not immediately forward the Demand Letter to Jayne's Motor Freight because the Demand Letter was "not a bankruptcy document and ... because only the Trustee [Levitt] was then empowered to act on behalf of Debtor's estate." *Id.*, ¶¶ 7–9. Additionally, Wasserman contended he had no authority to accept notices on behalf of Defendants. *Id.*, ¶ 11. According to Wasserman, he was precluded by the Bankruptcy Code and relevant case law from representing the principals or potentially related entities of a debtor corporation. *Id.*

For unstated reasons, on or about 2 March 1990, Wasserman finally forwarded a copy of the Demand Letter to the attorneys for the Individual Defendants. Willard Jayne, Douglas Jayne and Gary Jayne admit receiving a copy of the Demand Letter on 8 March 1990 when their attorney forwarded a copy of the Demand Letter to them. W. Jayne Aff., ¶ 24; D. Jayne First Aff., ¶¶ 18, 19; G. Jayne Aff., ¶ 17.

The Trustees claim they did not discover that Willard Jayne, Douglas Jayne and Gary Jayne owned Elizabethport until Jayne's Motor Freight was undergoing Chapter 7 Bankruptcy proceedings. Vaccaro Aff., ¶ 13. Accordingly, on 23 April 1990, the Fund Administrator, Edward J. Geiger, sent certified letters to Elizabeth-

---

**7.** The Demand Letter states, "The first quarterly installment is due no later than January 17, 1988, which is 60 days after the date of this demand...." Demand Letter, ¶ 3. It appears that the date January 17, 1988 is in error and should have read "January 17, 1989."

port and each of its three general partners [8] notifying them that Jayne's Motor Freight was delinquent in making its withdrawal liability payments and that each is responsible for the withdrawal liability. *Id.*, ¶ 14. The certified letters were claimed by Douglas Jayne on 24 April 1990. *Id.*, ¶ 15.[9]

On 1 May 1990, Willard Jayne, as a creditor of Jayne's Motor Freight, filed a motion in the Bankruptcy Proceeding objecting to Plaintiffs' Proof of Claim. W. Jayne Aff., ¶ 27. Willard Jayne contended the amount asserted in the Proof of Claim was excessive for failing to apply reductions provided to insolvent employers undergoing liquidation pursuant to 29 U.S.C. § 1405. *Id.*

On 27 June 1990, the Fund and the Trustees commenced a suit against Defendants in the United States District Court for the Eastern District of Pennsylvania. Plaintiffs excluded Jayne's Motor Freight from their suit.

On 30 November 1990, Judge Hutton issued a scheduling order (the "Scheduling Order") which set 10 May 1991 as a deadline for the completion of discovery. Scheduling Order of Judge Hutton, dated 30 November 1990. During the discovery period, Defendants served a document request and interrogatories on Plaintiffs. Pls.' Objections to Defs.' Req. to Reopen and to Take Further Disc. at 2. Plaintiffs served timely responses to the requests and included objections to some of the discovery requests. *Id.* The parties exchanged correspondence concerning the validity of the objections to the discovery requests.[10] In the meantime, Judge Hutton transferred the action to the District of New Jersey on 26 March 1991.

Following the close of the discovery period, as set by Judge Hutton, Defendants moved before Ronald J. Hedges, United States Magistrate Judge, to reopen and to take discovery and to compel discovery. In a conference call with Magistrate Judge Hedges on 16 July 1991, Defendants' counsel identified two general areas in which they sought discovery. These areas included the calculation of withdrawal liability and the knowledge of the Trustees as to the existence and whereabouts of other entities which may be jointly liable for the withdrawal liability of Jayne's Motor Freight. *Id.* at 3.

The parties' counsel appeared for oral argument before Magistrate Judge Hedges on 30 July 1991 on Defendants' request for discovery. Defs.' Req. to Reopen and Take Further Disc. Magistrate Judge Hedges issued an order (the "First Discovery Order") on 9 August 1991 rescinding the Scheduling Order issued by Judge Hutton. First Discovery Order. Additionally, Magistrate Judge Hedges ordered Plaintiffs to respond and produce certain documents pertaining to the assessment and calculation of withdrawal liability [11] and to re-

---

**8.** The three general partners of Elizabethport (and Bro–Jen) are Willard Jayne, Douglas Jayne and Gary Jayne.

**9.** Gary Jayne contends Plaintiffs knew of Elizabethport as early as 7 June 1988 when Gary Jayne's attorneys sent Plaintiffs a letter informing them Elizabethport is a partnership owned by Gary Jayne and other members of his family. G. Jayne Aff., ¶¶ 13–14.

**10.** *See* Letter to Catherine Reid (Plaintiffs' counsel) from Bruce Ettman (Defendants' counsel), dated 21 March 1991; Letter to Bruce Ettman from Catherine Reid, dated 11 April 1991; Letter to Catherine Reid from Bruce Ettman, dated 17 April 1991; Letter to Bruce Ettman from Catherine Reid, dated 29 April 1991; Letter to Catherine Reid from Bruce Ettman, dated 18 July 1991.

**11.** Plaintiffs were ordered to

respond to and produce documents in response to (a) Demands 1, 2, 3, 4, 5, 6, 7 and 8 of Defendants' First Demand for Production of Documents to the extent that said documents pertain to the assessment and calculation of withdrawal liability of Jayne's Motor Freight, Inc. and/or the amount of said withdrawal liability and (b) Demand 11 in all respects.

First Discovery Order, dated 9 August 1991.

Additionally, Plaintiffs were ordered to produce documents listed in Schedule A of the Discovery Order. These documents included: Pension plan documents, including all amendments; Summary Plan Description (SPD), including all amendments; copy of Trust Agreement, including all amendments; copy of all annuity contracts, if any; copy of Martin E. Segal complete actuarial reports (often referred

spond to interrogatory thirty of the Defendants' First Set of Interrogatories. *Id.* Defendants were ordered to submit an expert's report (the "Expert's Report") assessing the calculations made by Plaintiffs. *Id.*

On 4 September 1991, Magistrate Judge Hedges informed counsel he intended to rescind the First Discovery Order because he did not believe the broad discovery which he had previously ordered was necessary. Spadoro Aff., ¶ 6. In a conforming order, dated 17 September 1991 (the "Second Discovery Order"), Magistrate Judge Hedges stayed all discovery in the case pending a decision on the cross-motions for summary judgment. Second Discovery Order, ¶ 2. Discovery was limited to documents setting forth the contribution histories for employers who contributed to the Fund from 1978. *Id.* Magistrate Judge Hedges retained the requirement that an Expert's Report be submitted by 13 September 1991. *Id.*, ¶ 5.

On 13 September 1991, Defendants filed a copy of their Expert's Report. In an affidavit submitted with the Expert's Report, George Spadoro ("Spadoro"), Defendants' attorney, asserted that some of the documents ordered by Magistrate Judge Hedges to be produced were withheld from production. Spadoro Aff., ¶ 5. Defendants' expert, Morton Dickstein ("Dickstein") reviewed the available documents and concluded several aspects of Plaintiffs' calculations may be incorrect. *Id.*, ¶ 8. Dickstein, in his Expert's Report, decided he could not compute the withdrawal liability of Jayne's Motor Freight without the withdrawal liability reports (the "Withdrawal Liability Reports"). Expert's Report, ¶¶ 3, 5.[12] According to Dickstein, the Withdrawal Liability Reports would provide specific information regarding how the Fund determined the unfunded vested benefits on which they based withdrawal liability. *Id.*, ¶ 4.

*Discussion*

Plaintiffs move for summary judgment for the failure of the Defendants to make withdrawal liability payments. Plaintiffs contend that Defendants are jointly and severally liable for the withdrawal liability of Jayne's Motor Freight. Plaintiffs argue that the Partnership Defendants are liable because they are in common control with Jayne's Motor Freight under ERISA. Plaintiffs also argue the Individual Defendants are liable as partners in the Partnership Defendants.

Defendants cross-move for summary judgment and alternatively for a stay of the litigation pending the completion of the bankruptcy proceedings. Defendants argue they are not liable because Plaintiffs have failed to notify them of their withdrawal liability as required by ERISA. 29 U.S.C. § 1399(b)(1). The Defendants also argue that Plaintiffs' summary judgment motion should be denied because they did not have a chance to conduct discovery. In the alternative, Defendants argue the time which they had to request review or arbitration under ERISA should be extended under the equitable tolling doctrine. Moreover, Defendants argue that if liability is imposed, the amount should be reduced under ERISA for employers who are insolvent.

## A. Summary Judgment Standard of Review

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist; a district court may not, however, resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,*

---

to as Annual Reviews) for each year since the plan year beginning 1 September 1979; copy of each withdrawal liability report prepared by Martin E. Segal Company; copy of each Form 5500, including all attachments, since the plan year beginning 1 September 1974; copy of the independent auditors' report for each plan year beginning 1 September 1980; and a description

of the data sent to the plan actuary for purposes of preparing each actuarial valuation since 1 September 1980. Schedule A of the First Discovery Order.

**12.** The Expert's Report contains no page numbers. References are to paragraphs as counted from the first paragraph.

477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir.1991) ("Summary judgment may not be granted ... if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed."). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Boyle v. Governor's Veterans Outreach & Assistance Center,* 925 F.2d 71, 75 (3d Cir. 1991); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989); *Joseph v. Hess Oil,* 867 F.2d 179, 182 (3d Cir.1989). " 'Any "unexplained gaps" in material submitted by the moving party ... if pertinent to material issues of fact, justify denial of a motion for summary judgment.' " *Ingersoll–Rand Fin. Corp. v. Anderson,* 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989) ).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied,* —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted).

Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *see* Fed.R.Civ.P. 56(e); *see also Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Bldg. Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("Summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case"); *Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 413 (3d Cir.1990) (" 'nonmoving party must adduce more than a mere scintilla of evidence in its favor,' " quoting *Williams v. Borough of West Chester,* 891 F.2d 458 (3d Cir.1989) ).

### B. Overview of MPPAA

[1] The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381–1461, under which Plaintiffs bring their claims, was enacted as an amendment to ERISA. The MPPAA was intended, in part, to discourage employers from withdrawing from multiemployer pension plans and leaving plans with inadequately funded liabilities. *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128, 130 (3d Cir.), *aff'd*, 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987); *Trustees of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc.*, 862 F.2d 1020, 1021 (3d Cir.), *cert. denied*, 490 U.S. 1082, 109 S.Ct. 2104, 104 L.Ed.2d 665 (1989); *Colteryahn Dairy, Inc. v. W. Pennsylvania Teamsters & Employees Pension Fund*, 847 F.2d 113, 116 (3d Cir.), *cert. denied*, 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989); *Flying Tiger Line v. Teamsters Pension Trust Fund*, 830 F.2d 1241, 1243 (3d Cir.1987).[13] The MPPAA attempts to do so by imposing upon the employer a mandatory liability, defined in the statute as the employer's adjusted "allocable amount of unfunded vested benefits." 29 U.S.C. § 1381(b)(1). "ERISA also established the Pension Benefit Guaranty Corporation ("PBGC"), a government corporation, to insure employees' benefits against a plan's termination for insufficient funds." *Yahn & McDonnell*, 787 F.2d at 130.

Under MPPAA's statutory scheme, once an employer withdraws from a pension plan, the plan's trustees determine the amount of withdrawal liability. 29 U.S.C. § 1381. The trustees are then required to notify the employer of the liability, provide a schedule for payments and otherwise formally demand payment. 29 U.S.C. § 1399(b)(1). Within ninety days after receiving notice, the employer has the option of requesting review of the liability by the plan's trustees. *Id.*, § 1399(b)(2)(A). Either party may initiate arbitration proceedings if the dispute over the existence or amount of liability persists after review. *Id.*, § 1401(a)(1).

■ "Provisions for the quick and informal resolution of withdrawal liability disputes are an integral part of MPPAA's statutory scheme." *Flying Tiger*, 830 F.2d at 1244; *see also Colteryahn Dairy*, 847 F.2d at 117. Therefore, regardless of whether an employer requests review of the liability amount, initiates arbitration or does nothing at all, the employer must begin making interim payments of the withdrawal liability in accordance with the plan's schedule within sixty days of notice. 29 U.S.C. §§ 1399(c)(2), 1401(d). This has been characterized as a "pay now, dispute later" procedure. *Flying Tiger*, 830 F.2d at 1244 (quoting *Robbins v. Pepsi–Cola Metro Bottling Co.*, 636 F.Supp. 641, 677 (N.D.Ill.1986)).

### C. Joint and Several Liability of Elizabethport and Bro–Jen

Section 1301(b)(1) provides, in part, that: [A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a *single employer* and all such trades and businesses as a *single employer*.

29 U.S.C. § 1301(b)(1) (emphasis added). The threshold question for determining withdrawal liability under ERISA, therefore, is determining which entities form the single employer ("Single Employer") subject to withdrawal liability. A finding that Elizabethport and Bro–Jen are trades or

---

**13.** Congress enacted MPPAA's "intricate scheme in response to evidence that the preexisting pension plan termination insurance program, enacted as title IV of [ERISA], perversely operated to provide employers with an incentive to withdraw from financially weak plans. The tendency of employers to abandon financially fragile plans posed a threat, in turn, to the solvency of the Pension Benefit Guaranty Corporation, the ERISA–created entity charged with administering the program and insuring payment of vested benefits when a plan terminates with insufficient assets.... The MPPAA was designed to shore up on these weak points." *Flying Tiger*, 830 F.2d at 1243 n. 1 (quoting *I.A.M. Nat'l Pension Fund, Plan A, A Benefits v. Clinton Engines Corp.*, 825 F.2d 415, 416 (D.C.Cir.1987)).

businesses under common control with Jayne's Motor Freight will subject them to joint and several liability as a Single Employer with Jayne's Motor Freight for the withdrawal liability. *Id.*, § 1399(b)(1); *see also Sheldon Hall*, 862 F.2d at 1024; *Flying Tiger*, 830 F.2d at 1244; *IUE AFL–CIO Pension Fund v. Barker & Williamson*, 788 F.2d 118, 123 (3d Cir.1986); *O'Connor v. DeBolt Transfer, Inc.*, 737 F.Supp. 1430, 1442 (W.D.Pa.1990); *United Food & Commercial Workers Union v. Progressive Supermarkets*, 644 F.Supp. 633, 636 (D.N.J.1986).

### 1. Common Control

[3] ERISA uses the "controlled group" standards of the Internal Revenue Code to determine whether two entities are within a controlled group and liable as a Single Employer.[14] *Flying Tiger*, 830 F.2d at 1244 n. 2; *Barker & Williamson*, 788 F.2d at 123; *Debolt Transfer*, 737 F.Supp. at 1440. Under the Internal Revenue Code, individuals are held to be in common control if: (1) they own a *controlling interest* in the relevant organizations; and (2) if they are in *effective control* of each organization. Businesses are deemed to be under common control where

> (i) the same five or fewer persons ... own ... a *controlling interest* in each organization, and (ii) taking into account the ownership of each such person only to the extent [that it] is identical with respect to each such organization, such persons are in *effective control* of each organization.

26 C.F.R. § 1.414(c)–2(c) (emphasis added). The term "organization" includes partnerships and corporations. *Id.*, § 1.414(c)–2(a). Although the tests for controlling interest and effective control overlap, the former goes to the issue of a controlling *ownership* interest whereas the latter focuses on effective *voting* control.

#### a. Controlling Interest

■ Under the first of the two-part test for common control, the same five or fewer individuals must own a controlling interest in each of the organizations to be held liable. In the case of a corporation, a controlling interest is defined as "ownership of stock possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote of such corporation...." *Id.*, § 1.414(c)–2(b)(2)(A). In the case of a partnership, a controlling interest is defined as "ownership of at least 80 percent of the *profits* interest or *capital* interest of such partnership...." *Id.*, § 1.414(c)–2(b)(2)(C) (emphasis added).

■ Willard Jayne, Douglas Jayne and Gary Jayne own a controlling interest in three organizations—Jayne's Motor Freight, Elizabethport and Bro–Jen. Jayne's Motor Freight issued one hundred shares of common stock. First Set at 8. On 8 December 1977, shares owned by Willard Jayne's brother, William Jayne, and his wife Virginia Jayne, were transferred back to the corporation, were not reissued and therefore became treasury stock ("Treasury Stock").[15] *Id.* In 1988, at the time Jayne's Motor Freight withdrew from the Fund,[16] Willard Jayne owned forty-five shares, his wife, Josephine Jayne, owned one share, Douglas Jayne owned two shares and Gary Jayne owned two shares. For purposes of determining control, the ownership of the share owned by Josephine Jayne is attributed to her husband, Willard

---

**14.** According to the *Barker & Williamson* court:

> ERISA specifically limits its adoption of the Internal Revenue Code in applying the controlled group principles of § 1563(a). ERISA refers for its definition of "common control" to 26 U.S.C. § 414(c). 29 U.S.C. § 1301. That section, in turn, adopts by reference "the principles similar" to those set forth at 26 U.S.C. § 414(b). Finally, § 414(b) provides that employees of a controlled group within the meaning of 26 U.S.C. § 1563(a) shall be treated as employed by a single employer.

*Barker & Williamson*, 788 F.2d at 126–27.

**15.** Pursuant to 26 C.F.R. § 1.414(c)–(3), the term "stock" does not include treasury stock. The Treasury Stock, formerly owned by William Jayne and Virginia Jayne, therefore is not included in the calculation of the controlling interest of Jayne's Motor Freight.

**16.** Controlling interest is determined from the date when employers ceased all "covered operations." *Barker & Williamson*, 788 F.2d at 123.

Jayne.[17] The controlling interest of Jayne's Motor Freight can be characterized as follows:

| | Number of Shares | Percent of Shares |
|---|---|---|
| Willard Jayne | 46 | 92% |
| Douglas Jayne | 2 | 4% |
| Gary Jayne | 2 | 4% |

Together, the three individuals owned a controlling interest in more than eighty percent of the corporation's combined voting power at the time of its withdrawal from the Fund.

Willard Jayne, Douglas Jayne and Gary Jayne also own at least eighty percent of the profits interest or capital interest—and therefore own a controlling interest—in the Partnership Defendants, Elizabethport and Bro–Jen. *See* Elizabeth Partnership Agreement att. as Ex. H to Pls.' Motion for Summary Judgment at 2; Bro–Jen Partnership Agreement att. as Ex. J to Pls.' Motion for Summ.J. (collectively, the "Partnership Agreements"). The controlling interest of each of the Partnership Defendants can be characterized as follows:

| | Annual Share of Net Profits |
|---|---|
| Willard Jayne | 80% |
| Douglas Jayne | 10% |
| Gary Jayne | 10% |

#### b. Effective Control

■■■ Persons satisfy the effective control part of the common control test if, in the case of a corporation, such persons own stock possessing more than fifty percent of the total combined voting power of all classes of stock.[18] 26 C.F.R. § 1.414(c)–2(c). In the case of a partnership, such persons must own an aggregate of more than fifty percent of the profits interest or capital interest of the partnership. *Id.*

Willard Jayne, Douglas Jayne and Gary Jayne's controlling interest in the common stock of Jayne's Motor Freight is sufficient to establish effective control. The Partnership Agreement for each Partnership Defendant divides the profits interests per partner as follows: Willard Jayne, eighty percent; Douglas Jayne, ten percent; and Gary Jayne, ten percent. The Internal Revenue Service 1065 Forms ("U.S. Partnership Return of Income") prepared for each Partnership Defendant for the tax year 1988 reflect the same percentages of profit and loss sharing as set forth in the partnership agreements. U.S. Partnership Return of Income att. as Exs. I and K to Pls.' Motion for Summ.J. Defendants' ownership interests thus satisfy the "effective control" test established by treasury regulations.

#### 2. *Elizabethport and Bro–Jen as Trades or Businesses*

Under ERISA, the meaning of "trade or business" is the same as its meaning under the Internal Revenue Code, 26 U.S.C. § 414(c), and the regulations issued thereunder. 29 C.F.R. § 2612.2; *see also Progressive Supermarkets*, 644 F.Supp. at 637. Although there are numerous references to the phrase "trade or business" in the Internal Revenue Code, the phrase has "not been defined by either the Code or the Treasury regulations, nor has any authoritative judicial definition of the terms evolved." *Id.*

Defendants argue that the reference to "trade or business" in 29 U.S.C. § 1301(b)(1) requires some form of inter-

---

**17.** Pursuant to 26 C.F.R. § 1.414(c)–(4)(b)(5), an individual is considered to own an interest otherwise owned by his or her spouse.

**18.** The relevant provisions of 26 C.F.R. § 1.414(c)–2(c) provide:

*Brother-sister group of trades or business under common control—(1) In general.* The term "brother-sister group of trades or business under common control" means two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of

§ 1.414(c)–4) a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization. The five or fewer persons whose ownership is considered for purposes of the controlling interest requirement for each organization must be the same persons whose ownership is considered for purposes of the effective control requirement.

26 C.F.R. § 1.414(c)–2(c).

company dealings in order to impose joint and several liability. Defs.' Br. at 21. Accordingly, they argue that neither Elizabethport nor Bro–Jen is a trade or business and consequently cannot be held liable. Additionally, they argue they had no improper motive in creating Elizabethport and Bro–Jen and therefore are not subject to the withdrawal liability of Jayne's Motor Freight. 29 U.S.C. § 1392(c).

Courts have held that two entities engaged in a leasing relationship could be held to be trades or business under common control within the meaning of 29 U.S.C. § 1301(b)(1). *Progressive Supermarkets*, 644 F.Supp. at 638–39; *Pension Benefits Guar. Corp. v. Center City Motors*, 609 F.Supp. 409, 412 (S.D.Cal.1984) (holding that rental property under a net lease constitutes a trade or business); *Teamsters Pension Trust Fund v. Malone Realty Co.*, 82 B.R. 346, 350 (Bankr. E.D.Pa.1988) (holding that a partnership or proprietorship that does no more than lease real estate, even on a net lease basis, constitutes a trade or business within the meaning of 29 U.S.C. § 1301(b)(1) ). Under a leasing relationship, joint and several withdrawal liability would be imposed on both the lessor and lessee even if one of the entities bore nearly all of the responsibilities under the lease. *Progressive Supermarkets*, 644 F.Supp. at 639. The two entities would therefore be considered a single employer and be held jointly liable for withdrawal liability. *Id.; see also Sheldon Hall*, 862 F.2d at 1024; *Board of Trustees of the W. Conference of Teamsters Pension Trust Fund v. Lafrenz*, 837 F.2d 892, 893 (9th Cir.1988); *Center City Motors*, 609 F.Supp. at 412.

■ In this case, although an economic relationship is not necessary to find a "trade or business," there is an economic relationship between Elizabethport and Jayne's Motor Freight. At the time of withdrawal, Elizabethport leased its sole asset, the Elizabeth Property, to Jayne's Motor Freight. W. Jayne Aff., ¶¶ 12–14; G. Jayne Aff., ¶ 3. The leasing relationship between Jayne's Motor Freight and Elizabethport is not required to hold that Eliza-

bethport is a "trade or business" within the meaning of 29 U.S.C. § 1301(b)(1), but is an additional reason to do so. *Progressive Supermarkets*, 644 F.Supp. at 638–39; *Center City Motors*, 609 F.Supp. at 412; *Malone Realty*, 82 B.R. at 350. Common ownership is the test.

■ Bro–Jen owns and leases one property, the Southampton Property. W. Jayne Aff., ¶ 5; D. Jayne First Aff., ¶ 7; G. Jayne Aff., ¶ 4. Plaintiffs do not contend that Bro–Jen leases the Southampton Property to Jayne's Motor Freight or that it is otherwise economically related to Jayne's Motor Freight. Common ownership, however, is all that is required for joint and several liability to attach. *Lafrenz*, 837 F.2d at 894–95; *DeBolt Transfer*, 737 F.Supp. at 1443–44. As mentioned, no showing of an economic relationship is necessary under 29 U.S.C. § 1301(b)(1). In considering this very issue, the *DeBolt Transfer* court noted:

Defendants contend that the establishment of control group liability requires proof of active supervision by the common owner, or at least some showing of economic relationship between members of the controlled group or its owners. These arguments are both legally misplaced and factually inaccurate.... In any event, this Court does not have to reach these issues since *the existence or non-existence of inter-company transactions is not relevant to the existence of controlled group withdrawal liability.*

737 F.Supp. at 1443–44 (emphasis added). The *DeBolt Transfer* court held, moreover, that "[w]hile it is true that the controlled group members in many of the decisions which are cited have had inter-company dealings and common ownership, under 29 U.S.C. § 1301(b)(1), *common ownership alone is all that is required for joint and several controlled group withdrawal liability.*" *Id.* at 1445 (emphasis added); *accord Lafrenz*, 837 F.2d at 894–95.

Defendants also attempt to stave off joint and several liability by arguing that they lack the "evade or avoid" motive required to impose liability. According to

Defendants, ERISA's controlled group withdrawal liability provisions were enacted to "prevent a business from limiting its responsibilities under ERISA by the fractionalization of its business operations." Defs.' Br. at 22–23 (quoting *Center City Motors,* 609 F.Supp. at 412). As such, Defendants contend that absent a motive to "fractionalize," or to "evade and avoid" liability, neither Elizabethport nor Bro–Jen can be held jointly and severally liable.[19] Defs.' Br. at 22–24.

■ ERISA joint and several liability, however, is not contingent on a finding of a motive to fractionalize. *See, e.g., DeBolt Transfer,* 737 F.Supp. at 1443–44. Although the purpose of controlled group liability is to prevent the creation of related entities to avoid liability, courts do not rely upon findings of improper motive or evasion to hold "trade or business" members of a controlled group liable. "The statute provides for controlled group liability without inquiry into the purposes for creating the entities within the controlled group." *Connors v. Petitte Bros. Mining Co., Inc.,* No. 87–0490, 1989 WL 3723 (D.D.C. 2 March 1989). As the *DeBolt Transfer* court noted:

> The significance of the statutory determination that all members of the controlled group are to be treated as though they constitute a single employer is that the Fund is not required to prove that the controlled group members abused their separate identities to evade or avoid withdrawal liability. *The Fund is not required to show anything other than mere common ownership.*

737 F.Supp. at 1142 (emphasis added).

Moreover, the policy against fractionalization operates only inasmuch as it is consistent with promoting the central purpose of ERISA. Congress designed ERISA to protect the interests of participants and

beneficiaries in financially distressed multiemployer plans and to ensure the security of such benefits to plan participants. *See, e.g., Barker & Williamson,* 788 F.2d at 127. Allowing controlled group members to escape liability by merely asserting lack of bad faith (or lack of a fractionalization motive) would defeat the purpose behind ERISA. Joint and several liability is therefore properly imposed in this case against the controlled group members.

**D. Personal Liability of Willard Jayne and Gary Jayne**

Plaintiffs contend that Willard Jayne and Gary Jayne are personally liable for the withdrawal liability of Jayne's Motor Freight in their capacities as partners of Elizabethport and Bro–Jen.[20] Pls.' Br. at 19–21. For the reasons previously stated, the Partnership Defendants are jointly and severally liable as members of the controlled group. *Sheldon Hall,* 862 F.2d at 1024; *Flying Tiger,* 830 F.2d at 1244; *Barker & Williamson,* 788 F.2d at 123; *DeBolt Transfer,* 737 F.Supp. at 1442; *Progressive Supermarkets,* 644 F.Supp. at 636.

■ The status of Willard Jayne and Gary Jayne as *partners* of Elizabethport and Bro–Jen, in turn, subjects them to the liability of the Partnership Defendants as "the proprietor[s'] [or partners'] personal assets and the proprietor[s'] [or partners'] business assets are legally a single financial estate." *Sheldon Hall,* 862 F.2d at 1025; *see also Progressive Supermarkets,* 644 F.Supp. at 642 (court construed ERISA to provide for liability by partners in their capacity as individuals for withdrawal liability of general partnership which was under common control with withdrawing employer).

---

19. The relevant provision, known as the "evade or avoid" provision, governs

> [t]ransactions to evade or avoid liability. If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction.

29 U.S.C. § 1392(c). This requirement has been described as a "good faith requirement." *Dorn's Transp., Inc. v. Teamsters Pension Trust Fund,* 787 F.2d 897, 902 (3d Cir.1986).

20. As noted previously, Douglas Jayne is a debtor in a personal bankruptcy proceeding. Plaintiffs' motion for summary judgment does not include Douglas Jayne.

The Individual Defendants argue that even if they may be individually liable, the pending Bankruptcy Proceeding for Jayne's Motor Freight mandates, at the very least, a stay of the current proceedings. Defs.' Br. at 28–32. Jayne's Motor Freight's pending Chapter 7 Bankruptcy, however, does not alter the personal liability of Willard Jayne and Gary Jayne in their capacities as partners of Elizabethport and Bro–Jen. Their personal liability for the withdrawal liability of Jayne's Motor Freight is based on their status as co-partners in the Partnership Defendants rather than on their status as corporate officers or shareholders of Jayne's Motor Freight. The bankruptcy of Jayne's Motor Freight therefore does not relieve Willard Jayne and Gary Jayne of their personal liability.

Even if the partnerships themselves were undergoing dissolution procedures, personal liability may still attach to Willard Jayne and Gary Jayne:

> Congress explicitly provided for individual liability of employers who operate as sole proprietors [or partnerships] in 29 U.S.C. § 1405(c).... Section 1405(c) protects only those assets which would be exempt under the Bankruptcy Code from being used to satisfy withdrawal liability of sole proprietors. The clear implication, therefore, is that other personal assets of an individual which are not exempt under the Bankruptcy Code may be used to satisfy a sole proprietor's withdrawal liability.

*Sheldon Hall*, 862 F.2d at 1024.

The rule imposing personal liability on Willard Jayne and Gary Jayne is also consistent with general partnership law which holds partners liable for the obligations of their partnership, absent an agreement to the contrary. The law of New Jersey, the state in which Elizabethport and Bro–Jen were formed and operate, provides that "[a]ll partners are liable.... (b) Jointly for all other debts and obligations of the partnership...." N.J.Stat.Ann. § 42:1–15.

The Individual Defendants raise no genuine issue of material fact as to their status as partners of entities found to be in common control with Jayne's Motor Freight. Personal liability is therefore properly imposed on Willard Jayne and Gary Jayne. Summary judgment against these Individual Defendants is appropriate.

### E. Plaintiffs' Compliance With Notification Requirements

Satisfaction of the notification requirements of Section 1399(b)(1) is a precondition for withdrawal liability. 29 U.S.C. § 1399(b)(1). Therefore, even if the Defendants are jointly and severally liable, Plaintiffs must still show they afforded adequate notice of the withdrawal liability to Jayne's Motor Freight or other members of the controlled group. To comply with statutory notice provisions, Plaintiffs were required to, "as soon as practicable after an employer's complete or partial withdrawal," notify the employer of the "amount of liability," "the schedule for liability payments," and "demand payment in accordance with the schedule." *Id.*, § 1399(b)(1).

Although section 1399(b)(1) is explicit as to the type of information the notification is to contain, the statute is silent on how this notice is to be provided. The statute merely dictates that the plan sponsor "notify the employer" of the liability and provide a schedule for the liability payments and to demand payment in accordance with the statute. *Id.*, § 1399(b)(1). When a statute is silent on the type of notice required, a court must look to Congress and applicable case precedent to determine what type of notice requirements best comports with legislative purpose [21] and minimum constitutional requirements of due process.[22]

---

21. Courts should construe the MPPAA liberally to protect the employee participants in a fund. *Barker & Williamson*, 788 F.2d at 127.

22. The "elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.... The notice must be of such nature as reasonable to convey the required information...." *Mullane v. Central Hanover Bank*

Congress enacted the MPPAA "(1) to protect the interests of participants and beneficiaries in financially distressed multiemployer plans, and (2) ... to ensure benefit security to plan participants." *Barker & Williamson*, 788 F.2d at 127 (quoting H.R.Rep. No. 869, 96th Cong., 2d Sess. 71, *reprinted in* 1980 U.S.Code Cong. & Ad. News 2918, 2939); *see also Sheldon Hall*, 862 F.2d at 1021. The *Barker & Williamson* court held, moreover, that:

> Liberal construction of the MPPAA's notice provisions in favor of pension funds would be consistent with both these goals. Courts have indicated that because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans. *Smith v. CMTA–I.A.M. Pension Trust*, 746 F.2d 587, 589 (9th Cir.1984); *Rettig v. PBGC*, 744 F.2d 133, 155 (D.C.Cir. 1984).

788 F.2d at 127.

Defendants argue they are not jointly and severally liable for the withdrawal liability of Jayne's Motor Freight because Plaintiffs have failed to notify them of their liability as required by ERISA. Defs.' Br. at 7–17. Plaintiffs contend they have met the notification requirements. Pls.' Reply Br. at 2–11. At issue is whether notice to Jayne's Motor Freight and to the Individual Defendants was adequate and whether it served as notice to all members of the controlled group subject to the withdrawal liability of Jayne's Motor Freight.

When interpreting ERISA, "[courts] should consider the views of the PBGC and the IRS. For a court to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA, would be to 'embar[k] on a voyage without a compass.'" *Huber v. Casablanca Indus., Inc.*, 916 F.2d 85, 97 (3d Cir.1990) (quoting *Mead Corp. v. Tilley*, 490 U.S. 714, 726, 109 S.Ct. 2156, 2164, 104 L.Ed.2d 796 (1989)), *petition for cert. filed* (9 January 1991). According to the PBGC:

> [U]nder ERISA there is a unity of interest in the case of a controlled group of corporations since the entire group is considered to be a single employer for withdrawal liability and other purposes. Therefore, PBGC *believes that a notice of default sent to the contributing entity which is a member of a controlled group of corporations, within the meaning of section 4001(b)(1), constitutes constructive notice to the other members of the same controlled group.* Thus, PBGC finds that section 4219(c)(5)(A) does not require notice to the other members of a controlled group.

*Barker & Williamson*, 788 F.2d at 127 (quoting *Notice and Collection of Withdrawal Liability*, 49 Fed.Reg. 22642, 22644) (Discussion of Public Comments on Final Rule to be codified at 29 C.F.R. § 2644.1–2644.4) (emphasis supplied by the *Barker & Williamson* court).[23] Other courts which have dealt with this specific issue of constructive notice to members of a controlled group are in accord with the *Barker & Williamson* approach. *See, e.g., Sheldon Hall*, 862 F.2d at 1024 (holding that notice to withdrawing employer and partnership under common control was no-

---

*& Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citations omitted). It has been noted that:

> For more than a century the central meaning of procedural due process has been clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Baldwin v. Hale*, (68 U.S.) 2 Wall. 223, 233, 17 L.Ed. 531. *Windsor v. McVeigh*, 93 U.S. 274, 23 L.Ed. 914; *Hovey v. Elliott*, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215; *Grannis v. Ordean*, 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363. It is equally fundamental that the right to notice and an opportunity to be heard

"must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62.

*Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972).

**23.** The *Barker & Williamson* court "recognize[d] that because this statement by the PBGC was not promulgated as part of a regulation, and is merely a general statement of policy, it is therefore due little deference.... Nevertheless, we find its reasoning persuasive." *Barker & Williamson*, 788 F.2d at 127 (citations omitted). The reasoning is also persuasive here.

tice to partner in his individual capacity); *Yahn & McDonnell*, 787 F.2d at 132 n. 3 (holding that notice to subsidiary corporation constituted notice to its parent); *DeBolt Transfer*, 737 F.Supp. at 1442–43 (holding that notice to withdrawing employer sufficient to hold individual who was in common ownership liable); *Connors v. Calvert Dev. Co.*, 622 F.Supp. 877, 881–882 (D.D.C.1985) (holding that notice to employer constituted notice to all other members of controlled group even though they have not been served with separate notices of liability).

▮ Under the scenario most favorable to the Defendants, Willard Jayne, Douglas Jayne and Gary Jayne received notice of the withdrawal liability on 8 March 1990, the date they admitted they received a copy of the Demand Letter, W. Jayne Aff., ¶ 24; D. Jayne First Aff., ¶¶ 18, 19; G. Jayne Aff., ¶ 17, after their attorney forwarded to them a copy of the Demand Letter originally received by Levitt.[24] Notice to Willard Jayne, Douglas Jayne and Gary Jayne is therefore notice to all other members of the controlled group, including Elizabethport and Bro–Jen.[25] *See Barker & Williamson*, 788 F.2d at 127; *Sheldon Hall*, 862 F.2d at 1024; *Yahn & McDonnell*, 787 F.2d at 132 n. 3; *DeBolt Transfer*, 737 F.Supp. at 1442–43.

▮ Defendants argue, however, that they received the Demand Letter by "happenstance." Defs.' Br. at 12 n. 3. Such notice, according to Defendants, is flawed and not authorized by ERISA. *Id.* at 7–17. Defendants cite *Kaszuk v. Bakery & Confectionary Union*, 638 F.Supp. 365, 370 (N.D.Ill.1984), *aff'd in part and rev'd in part*, 791 F.2d 548, 557 (7th Cir.1986), for the proposition that such notice received inadvertently cannot validate an otherwise invalid attempt at providing notice.

The *Kaszuk* opinion, cited by Defendants, holds that the "Fund may not rely upon methods of notification found to be inadequate under ERISA to show that a participant received notice." 791 F.2d at 557. That case involved specific regulations (the "Regulations") which governed notice to *plan participants*, not the employer, of the benefits available under the pension plan. These Regulations provide for notice to be given "in person, by mailing, by posting, or by printing it in a publication of ... an employee organization which is distributed in such a manner so as to be reasonably available to such employee." 26 C.F.R. § 1.7476–2(c)(1).

In *Kaszuk*, the court held the fund's placement of relevant documents in various locations in the plant where the employees worked and advertisements in a newspaper failed to satisfy the notice requirements of the Regulations. *Kaszuk*, 791 F.2d at 556. Consequently, the attempted notice was improper and notice received by an employee who happened upon the relevant documents did not satisfy ERISA notice requirements. In the present case, no comparable regulations specify how notice is to be provided to the withdrawing employer. The rerouting of the Demand Letter therefore does not necessarily fail ERISA's notice requirements. Accordingly, the *Kaszuk* opinion does not control the issue of notice as presented in these motions.

▮ There is no requirement in section 1399(b)(1) that notice be given *directly* from a pension fund to either the contributing employer or other controlled group members. Defendants erroneously assert that ERISA's statutory notification standards require some "stringent" form of actual notice to Jayne's Motor Freight, or at the very least to a member of the controlled group, before withdrawal liability can be assessed. Defs.' Br. at 4–7; Defs.' Reply Br. at 13–17. According to Defendants, constructive notice to the contributing employer, Jayne's Motor Freight, is

---

**24.** Levitt had forwarded a copy of the Demand Letter to Wasserman. Wasserman, in turn, had forwarded a copy of the Demand Letter to Defendants' attorney. Wasserman Aff., ¶¶ 7–12.

**25.** It does not matter whether Willard, Douglas or Gary Jayne received the 8 March 1990 notice in their capacity as shareholders of Jayne's Motor Freight, partners of Elizabethport and Bro–Jen, or as individuals liable under general partnership law for their partnerships' liabilities. Notice to any entity in a control group constitutes notice to all members.

not sufficient to impute notice constructively to other members of the controlled group. *Id.*

 Defendants argue that ERISA requires "actual" notice of the withdrawal liability to be given to the employer. Defs.' Br. at 7–9. The terms "actual" or "constructive" notice are not terms found in the language of section 1399(b)(1). Defendants' reliance on this argument is misguided. Actual notice to the contributing employer, Jayne's Motor Freight, is not a prerequisite to determining that notice was given to other members of the controlled group. Rather notice to *any* member of a controlled group is sufficient to impute notice to *any other* member of the controlled group. *See, e.g., Sheldon Hall*, 862 F.2d at 1024; *Barker & Williamson*, 788 F.2d at 127; *Yahn & McDonnell*, 787 F.2d at 132 n. 3.

In support of their position, however, Defendants quote the following language from the Third Circuit: *"deeming that actual notice to the employer serves as constructive notice to [the controlled group] is consistent with ... ERISA."* Defs.' Br. at 12 (quoting *Barker & Williamson*, 788 F.2d at 127) (emphasis added in brief). Defendants misread the opinion. Holding that actual notice is consistent with ERISA does not mean that *only* actual notice will meet ERISA's statutory notice requirements. Constructive notice to controlled group members satisfies the notice requirements of section 1399(b)(1). *Sheldon Hall*, 862 F.2d at 1024; *Barker & Williamson*, 788 F.2d at 127; *Yahn & McDonnell*, 787 F.2d at 132 and n. 3.

In further support of their position, Defendants cite cases which they contend require actual notice where a statute or contract requiring notice fails to specify the method of notice. Defs.' Reply at 4. The cases they cite, however, do not stand for the proposition that actual notice is required. *See Creasy v. United States*, 4 F.Supp. 175, 178 (W.D.Va.1933); *Franks v. Bowman Transp. Co.*, 495 F.2d 398, 404–05 (5th Cir.), *rev'd on other grounds*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *General Motors Corp. v. Swan Carburetor Co.*, 88 F.2d 876, 885 (6th Cir.), *cert. denied*, 302 U.S. 691, 58 S.Ct. 49, 82 L.Ed. 534 (1937); *In re Venson*, 234 F.Supp. 271, 272 (N.D.Ga.1964), *aff'd*, 337 F.2d 616 (1964). Rather, these cases hold that various notice requirements of private contracts and other non-ERISA statutes were not met where parties received *no* notice whatsoever. In those situations where no notice was provided, actual notice was required.[26]

---

**26.** Defendants contend the *Creasy* court held that:

"[w]hen it is required that any notice be given or paper filed to or with a specified person or place, without provision as to the means of so doing, there rests on the person required to give such notice or file such paper the obligation to see that it is *actually* given or filed. If he contents himself with merely mailing such notice or other paper, he runs the risk that it may be delayed beyond the specified time or may be lost and never delivered at all.... *A person imposed with the duty of giving notice to another cannot be said to have fulfilled that duty when it is an established fact that the latter person never received the notice* [Emphasis supplied]."

Defs.' Reply Br. at 4 (quoting *Creasy v. United States*, 4 F.Supp. at 178) (emphasis supplied in Defs.' Reply Br.). The *Creasy* court dealt with whether a veteran's claim for war risk insurance is deemed to be received on the day it is filed or the day it is mailed by the claimant for the purposes of determining whether the claim was properly filed within the relevant statute of limitations. 4 F.Supp. at 177. In that context,

the *Creasy* court held that merely mailing a claim shortly before the statute of limitations expired will not ensure that the claim will be received in time. *Id.* at 178. In the present case, the risk that a party may not receive notice was removed once the Individual Defendants actually received notice. The other opinions cited by Defendants similarly do not support the proposition that actual notice is required, especially in the ERISA context.

The *Franks* opinion also held that notification occurs only when notice has been sent and received. *Franks*, 495 F.2d at 404. In that case, a nephew received a certified letter regarding a Title VII claim for his uncle, but lost the letter before being able to deliver it to his uncle. *Id.* at 403. The uncle knew that his nephew signed for the letter but never actually saw a copy of the letter. The court held that the uncle was not notified because he never saw the letter. *Id.* at 404–05. In this case, Defendants do not dispute that they received actual notice. The *Franks* opinion therefore does not control.

In *General Motors Corp.*, the court reviewed a patent license agreement which required the

In this case, it is undisputed that Willard Jayne, Douglas Jayne and Gary Jayne received a copy of the Demand Letter. W. Jayne Aff., ¶ 24; D. Jayne First Aff., ¶¶ 18, 19; G. Jayne Aff., ¶ 17. This suffices as notice to all other members of the controlled group. *See Barker & Williamson,* 788 F.2d at 127; *Sheldon Hall,* 862 F.2d at 1024; *Yahn & McDonnell,* 787 F.2d at 132 n. 3; *DeBolt Transfer,* 737 F.Supp. at 1442–43. Defendants raise no genuine issue of material fact that they did not receive a copy of the 8 March 1990 Demand Letter. As a matter of law, they are deemed to have received notice when they received the Demand Letter on 8 March 1990.

### F. Other Notice Attempts

#### 1. *Notice to the Bankruptcy Attorneys*

Plaintiffs' first attempt at notification occurred on 17 November 1988 when Vaccaro sent a Demand Letter to Jayne's Motor Freight via registered mail. Defendants contend the letter did not constitute sufficient notice because they did not actually receive the Demand Letter at that time [27] and because it was received by a person not authorized as an agent for them.

■■■■■ The act of sending the Demand Letter, in and of itself, does not guarantee receipt of notice and Plaintiffs may not rely on this alone to establish they have met notice requirements. *Beasley v. Wollman,* No. 85–7338, slip op., 1986 WL 4827 (E.D.Pa. 18 April 1986) (no notice where Post Office failed to deliver demand letter). The fact that Levitt, bankruptcy trustee for Jayne's Motor Freight, received the Demand Letter also does not constitute notice unless it can be established that Levitt was either an actual or apparent agent of Jayne's Motor Freight or the other members of the controlled group or that he forwarded it to one of the Defendants. The same can be said of Wasserman, an attorney retained by Jayne's Motor Freight to represent it in Chapter 11 Bankruptcy. Although Levitt had forwarded a copy of the Demand Letter to Wasserman on 24 November 1988, Plaintiffs do not contend that either Levitt or Wasserman forwarded a copy of the demand letter to Defendants before 8 March 1990.

Plaintiffs contend that notice to the withdrawing employer's attorney of record in the bankruptcy proceedings was sufficient notice to the debtor. Pls.'s Reply Br. at 8. The decisions which have held that notice to a bankruptcy trustee, such as a proof of claim, constitutes sufficient notice have involved Chapter 11 bankruptcy proceedings.

---

licensor to institute suit for patent infringement within ninety days of being notified of the manufacture of potentially infringing products by the licensee. 88 F.2d at 885. Failure to institute a suit deprived the licensor of its rights to royalties. In construing this contract, the court considered whether the words "upon being notified" required mere knowledge of a patent infringement or whether it required actual notification. In light of the fact that no notification was even attempted, the court held actual notification was required to protect the licensee from liability. *Id.* The construction of a private contract requiring actual notice cannot be said to require actual notice in the ERISA context. Accordingly, *General Motors* does not control here.

Finally, *Venson* dealt with a bankruptcy statute that required notification to creditors through "notice or actual knowledge." 234 F.Supp. at 273. The court there specifically construed the meaning of the notification requirement "within the intent of this provision." *Id.* The interpretation of the *Venson* court concerning the notice requirements of a specific bankruptcy provision cannot be said to control here.

**27.** Although addressed to Jayne's Motor Freight at its business address, the Demand Letter was received by Levitt. The parties disagree over how the letter was rerouted to Levitt. Plaintiffs claim that the Demand Letter was mailed to 860 North Avenue, Elizabeth, New Jersey—the address to which the Fund had sent all correspondence for Jayne's Motor Freight and from which Jayne's Motor Freight operated for many years. Vaccaro Aff., ¶ 11. According to Plaintiffs, at some point after Vaccaro had posted the Demand Letter, via registered mail, a sticker was placed over the Elizabeth Property address, redirecting the Demand Letter to Levitt. Pls.' Reply Br. at 4. Plaintiffs profess no knowledge of who redirected the Demand Letter to Levitt; they surmise it may have been the post office or Douglas Jayne because the Individual Defendants and Defendants have admitted that Douglas Jayne receives mail at the Elizabeth Property. Pls.' Reply Br. at 4–5. Douglas Jayne denied having redirected the letter. D. Jayne Second Aff., ¶ 3.

*See, e.g., Central States, S.E. and S.W. Area Pension Fund v. Superior Moving Servs., Inc.*, No. 89 C 7385, slip op., 1990 WL 19890 1990 U.S.Dist.LEXIS 2066 (N.D.Ill. 20 February 1990). For purposes of this dispute, the difference between Chapter 7 and Chapter 11 proceedings rests on the relative functions the trustee and attorney play in these proceedings and the impact of these functions on the likelihood that the withdrawing employer will receive notice. In a Chapter 11 proceeding, the debtor corporation is generally "allowed to continue operating itself as debtor-in-possession. Hence, proofs of claim scheduled in the bankruptcy are generally seen by the debtor-in-possession and/or its counsel." *Superior Moving Services*, 1990 WL 19890, 1990 U.S.Dist.LEXIS 2066.

The Proof of Claim in this case was filed on 23 February 1989. Proof of Claim att. as Ex. A to Pls.' Reply Br. The Chapter 11 Bankruptcy was previously converted to a Chapter 7 liquidation proceeding on 29 January 1988. Wasserman Aff., ¶ 4; W. Jayne Aff., ¶ 16. Wasserman, at the time he received the Demand Letter from Levitt, was no longer functioning in his capacity as the Defendants' attorney in a Chapter 11 proceeding. It cannot be said, therefore, that Wasserman properly received notice on behalf of Defendants at the time the Proof of Claim was filed.

In a Chapter 7 proceeding, the court appoints a trustee to oversee the dissolution. The trustee for the corporation has "no duty to inform the debtor corporation or its shareholders of proofs of claim or to in any way notify them of claims against the corporation." *Superior Moving Services*, 1990 WL 19890, 1990 U.S.Dist.LEXIS 2066.

Thus, notice to Levitt cannot be said to be notice to Defendants.

### 2. Receipt of Notice of Delinquent Payments on 24 April 1990

■ After failing to receive a reply from Defendants to the Demand Letter, the Fund Administrator sent letters on 23 April 1990 to Elizabethport and each of its three general partners. The letters notified them that Jayne's Motor Freight was delinquent in making its withdrawal liability payments and that each is responsible for the withdrawal liability. The certified letters were claimed by Douglas Jayne on 24 April 1990. Vaccaro Aff., Exhibit "A", ¶ 15.

A notice of default has been held to be a sufficient notice of demand for payment. *Debreceni v. George Lamoureux & Co.*, 629 F.Supp. 598, 601 (D.Mass.1986). Plaintiffs' notice of default serves as notice to Defendants of their withdrawal liability. *Id.* As discussed above, however, the 8 March 1990 notice date serves as the effective date of notice and the date from which the time period to request review of arbitration is calculated.

### 3. Plaintiffs' Filing of Proof of Claim in the Bankruptcy Proceeding on 23 February 1989

■ Plaintiffs do not seriously contend that the Proof of Claim filed in the Bankruptcy Proceeding, independent of the notice it may provide to the attorneys, operates as notice. The entire argument of the parties in support of and in opposition to this contention are contained in three short paragraphs and a footnote.[28] As Defen-

---

**28.** Plaintiffs' entire argument provides:

Even if actual notice to the trustee in bankruptcy and the attorney of record for the debtor were insufficient, Defendants clearly had notice once the amended proof of claim was filed in the bankruptcy court on February 27, 1989. (*See* Exhibit "A" attached hereto). Nevertheless, none of the Defendants contacted the Fund, made any withdrawal liability payments or requested review by the plan sponsor prior to arbitration.

Pls.'s Reply Br. at 8.

Defendants' entire argument provides:

The Plaintiffs' second choice in their multiple choice analysis is that the Fund's filing of a Proof of Claim in the Bankruptcy Proceeding, without more, satisfies the notification requirements of ERISA.

The Plaintiffs, of course, have provided no authority whatever for this peculiar theory. Section 1399(b)(1) requires that the Fund notify Jayne's [Motor Freight] of (a) the amount of liability; (b) the schedule of payments; and (c) demand payment in accordance with the schedule. The Fund's Proof of Claim, annexed to the Plaintiffs' Opposition Brief [Pls.'s Reply Br.] as Exhibit A, does not provide the

dants noted, support for this proposition is sparse. Defs.' Reply Br. at 15 and n. 17. For the purposes of this dispute, the Proof of Claim will not suffice as notice.

## G. Waiver of Arbitration and Right to Review of Withdrawal Liability

Under ERISA, requests for review of withdrawal liability and arbitration procedures must be initiated within certain statutorily prescribed time limits. To dispute a plan sponsor's determination of liability as set forth in the plan's demand letter, the employer must inform the plan sponsor of its disagreement and request a review of the determination within ninety days of receipt of notification. 29 U.S.C. § 1399(b)(2)(A)(i). An employer is still obligated to make withdrawal payments even if the employer disputes the existence or amount of withdrawal liability and has properly initiated review and arbitration. *Id.*, § 1399(c)(2).

 The plan sponsor must then review the determination and notify the employer of its decision and the reasons upon which the decision was based. *Id.*, § 1399(b)(2)(B). If the employer thereafter fails to initiate an arbitration proceeding within the time limitations set forth in 29 U.S.C. § 1401(a)(1),[29] "the amount demanded by the plan sponsor . . . shall be due and owing on the schedule set forth by the plan sponsor." *Id.*, § 1401(b)(1). Failure to adhere to these provisions constitutes a waiver of the right to later contest the amount of withdrawal or status as members of a controlled group in later litigation. *Barker & Williamson*, 788 F.2d at 128 (holding

that failure of controlled group members to contest their status as members of the controlled group subjected them to the full amount of withdrawal liability as determined by the pension fund); *see also Shiffert v. Tri-State Uniform, Inc.*, No. 87-7346, 1988 WL 65942, *2-3, 1988 U.S.Dist.LEXIS 5820, *6-8 (E.D.Pa. 22 June 1988) (holding that defendants waived their rights to contest issues of their liability as controlled group members and the amount of liability by failing to arbitrate).

 Defendants received notice on 8 March 1990. No attempts to initiate review or arbitration proceedings within the statutorily prescribed time period were made by Defendants. Because no genuine issues of material facts have been raised regarding the failure to initiate review or arbitration proceedings, Defendants have waived their right to contest the existence or amount of the withdrawal liability.

 Arbitration is an integral part of MPPAA's scheme to "secure the financial health of multiemployer pension plans." *Flying Tiger*, 830 F.2d at 1248; *see also Colteryahn Dairy*, 847 F.2d at 117. The Third Circuit has noted:

> Arbitration of withdrawal liability disputes substantially reduces the expenses incurred by multiemployer plans while it bears a burden that would otherwise fall on the federal courts. "[A]rbitration promotes judicial economy and judicial restraint, both because the arbitrator's decision may dispose of the suit, and even if one party appeals to the arbitrator's decision, the court will have the benefit of the arbitrator's analysis."

information required by Section 1399(b)(1) and, therefore, cannot, as a matter of law, be deemed to satisfy the notification requirements of Section 1399.

Defs.' Reply Br. at 15 (footnote omitted). The footnote accompanying the text above provides:

The Defendants' independent research has failed to uncover authority to support the Plaintiffs' argument. In fact, the Defendants submit that the Plaintiff's theory is so transparently frivolous that it should be disregarded out of hand by this Court.

*Id.*, n. 17.

**29.** The time limitations in Section 1401(a)(1) provide:

. . . Either party may initiate the arbitration proceeding within a 60-day period after the earlier of—

(A) the date of notification to the employer under Section 1399(b)(2)(B) of this title, or

(B) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title.

The parties may jointly initiate arbitration within the 180-day period after the date of the plan sponsor's demand under section 1399(b)(1) of this title.

29 U.S.C. § 1401(a)(1).

*Flying Tiger*, 830 F.2d at 1248 (quoting *Robbins v. Chipman Trucking, Inc.*, 8 Employee Benefits Ca. (BNA) 1251, 1258 (N.D.Ill.1986)). The court emphasized that " 'arbitration, and not the courts, is the proper forum for the initial resolution of disputes [under the MPPAA].' " *Id.* at 1249 (quoting *Republic Indus., Inc. v. Central Pa. Teamsters Pension Fund*, 693 F.2d 290, 295 (3d Cir.1982)).

Arbitration was the proper course of conduct for the disputes Defendants had with being held liable for the withdrawal liability of Jayne's Motor Freight. For example, the dispute the Defendants had concerning the "evade or avoid" issue should have also been resolved through arbitration. *Flying Tiger*, 830 F.2d at 1248. Additionally, it appears the dispute Defendants had with being considered a Single Employer subject to withdrawal liability should have been resolved through arbitration. *Flying Tiger*, 830 F.2d at 1249–50.

■ The *Barker & Williamson* holding that controlled group members also have the option of bringing a declaratory judgment action to have their status as controlled group members resolved by a federal court does not change the arbitration requirement in this case.[30] *Barker & Williamson*, 788 F.2d at 129. After discussing the review and arbitration options that a potential member of a controlled group may pursue, the *Barker & Williamson* court held:

> Moreover, a third course is available. If the corporation legitimately believes its status as a controlled group member is doubtful, it could bring a declaratory judgment action to have that question resolved by a federal court. In such a proceeding, the corporation could request that the court enjoin the running of the statutory period for seeking review and arbitration. *See, e.g., Republic Industries*, 693 F.2d at 292. We see nothing to prevent the corporation from requesting review by the fund and arbitration and making the interim payments to the fund contingent upon the outcome of the declaratory judgment action. If the feder-

al court later decided that the corporation was not a member of the controlled group, it could order the fund to return the payments.

*Id.*

The *Flying Tiger* court, however, specifically limited the *Barker & Williamson* holding to the facts of the case. 830 F.2d at 1250. In distinguishing *Barker & Williamson* from other situations, the *Flying Tiger* court stated:

> The factual context of *Barker & Williamson* defines one relatively clear limit on the declaratory judgment course of action. Our reference there to this "third course" of action referred to disputes, such as Sentinel's unsuccessful stock option/controlled group argument, that arise under MPPAA provisions that fall outside of the section 1381 through 1399 range. *The reference does not undermine section 1401's clear mandate that disputes within that range of sections be arbitrated.*
>
> ... In *Barker & Williamson*, the issue was whether Sentinel had become a MPPAA employer in time to incur liability for B & W's withdrawal. Here [in *Flying Tiger* ], the issue is whether Tiger ceased to be a MPPAA employer in time to avoid liability for Hall's withdrawal.

830 F.2d at 1250 (emphasis added).

The Defendants do not present an issue which parallels or even approaches that presented in *Barker & Williamson*. As the Third Circuit observed in *Flying Tiger*:

> Courts that have resolved employer status questions prior to arbitration have been concerned with entities that *never* have been employers subject to MPPAA and that, therefore, legitimately question application of MPPAA's dispute resolution procedures to them.

830 F.2d at 1251 (emphasis in original text).

As mentioned, "the central legal question in *Barker & Williamson* asked whether Sentinel's interest in certain B & W stock constituted an option that gave Sentinel constructive ownership over B & W" at the time B & W completely withdrew from the

---

**30.** Indeed, Defendants have not timely pursued such a declaratory action here.

multiemployer pension plan. *Flying Tiger*, 830 F.2d at 1250 (citing *Barker & Williamson*, 788 F.2d at 123).

There has never been a legitimate dispute as to the ownership of the Partnership Defendants and Jayne's Motor Freight. The percentages of ownership and persons possessing such percentages are not contested. There is no legitimate basis for the Defendants to argue they never have been "employers subject to MPPAA."

Despite congressional purpose to the contrary, the "pages of the Federal Reporter are replete with challenges to this mandate [to arbitrate], as litigants have attempted to bypass arbitration in favor of the federal courts and the courts have struggled to develop rules to determine when a MPPAA dispute must first go to arbitration." *Colteryahn Dairy*, 847 F.2d at 117 (citing, as examples, *Flying Tiger*, 830 F.2d 1241; *Dorn's Transp.*, 787 F.2d 897; *Republic Indus.*, 693 F.2d 290; *Grand Union Co. v. Food Employers Labor Relations Ass'n*, 808 F.2d 66 (D.C.Cir.1987)). Disputes in federal courts over matters that should have been arbitrated, however, fly squarely against this mandate of arbitration. The mandate is clear: "arbitrate first." *Colteryahn Dairy*, 847 F.2d at 117.

None of the Defendants have attempted to resolve their dispute with the Fund through arbitration. Consequently, all the Defendants have waived their rights to seek arbitration. *I.A.M. Nat'l Pension Fund, Plan A v. Slyman Indus., Inc.*, 901 F.2d 127, 129 (D.C.Cir.1990) (bankrupt employer's failure to arbitrate timely precludes solvent members of a controlled group from doing so later); *Barker & Williamson*, 788 F.2d at 129 (by doing nothing, Sentinal lost "the possibility of review and arbitration under MPPAA"); *DeBolt*

*Transfer*, 737 F.Supp. at 1443 (waiver of arbitration by one controlled group member constitutes a waiver for other members of the controlled group even if they did not receive separate notices); *see also Lafrenz*, 837 F.2d at 895; *Board of Trustees of W. Conference v. H.F. Johnson, Inc.*, 830 F.2d 1009, 1013–15 (9th Cir.1987); *Connors v. Brady–Cline Coal Co.*, 668 F.Supp. 5, 9 (D.D.C.1987); *Tri–State Rubber & Equipment, Inc. v. Central States, S.E. & S.W. Areas Pension Fund*, 677 F.Supp. 516, 521 (E.D.Mich.1987); *Connors v. Calvert*, 622 F.Supp. at 877.

By failing to pursue review and arbitration in a timely manner, Defendants are prohibited from doing so now. *Barker & Williamson*, 788 F.2d at 129. As the Third Circuit noted: "[The prohibition against further action] though seemingly harsh, is but a self-inflicted wound." *Id.*

## H. Reduction of Liability

Section 4225 of ERISA, 29 U.S.C. § 1405, provides for a reduction of the withdrawal liability assessed against an insolvent employer undergoing liquidation or dissolution.[31] Plaintiffs argue that Defendants have waived their right to reduction because they failed to exhaust their administrative remedies. Pls.' Br. at 26–27. Moreover, Plaintiffs argue Defendants have failed to prove insolvency. *Id.* at 27–28.

### 1. Whether the Defendants Waived Their Right to Reduction by Failing to Arbitrate the Issue

Arbitration is mandatory for any "dispute between an employer and a plan sponsor ... concerning a determination made under sections 1381 through 1399 of this title...." 29 U.S.C. § 1401(a)(1). Al-

---

**31.** Section 4225(b) of ERISA, 29 U.S.C. § 1405(b), provides:

In the case of an insolvent employer undergoing liquidation or dissolution, the unfunded vested benefits allocable to that employer shall not exceed an amount equal to the sum of—

(1) 50 percent of the unfunded vested benefits allocable to the employer (determined without regard to the section), and

(2) that portion of 50 percent of the unfunded vested benefits allocable to the employer (as determined under paragraph (1)) which does not exceed the liquidation or dissolution value of the employer determined—

(A) as of the commencement of liquidation or dissolution, and

(B) after reducing the dissolution value of the employer by the amount determined under paragraph (1).

29 U.S.C. § 1405(b).

though, section 1405(b) concerning the reduction of liability does not fall squarely within the arbitration requirement in the statute, "there are other indications from that statute that Congress intended arbitration for § 1405." *Canario v. Byrnes Express & Trucking Co., Inc.*, 644 F.Supp. 744, 748 (E.D.N.Y.1986), *vacated on other grounds*, 652 F.Supp. 385 (1987).[32] The *Canario* court wrote:

> First, § 1381(b)(1)(D) requires plan sponsors to consider § 1405 when adjusting withdrawal liability. Therefore, it seems clear that any decision of a plan sponsor under § 1381, and any subsequent arbitration, would have considered an employer's insolvency under § 1405. Second, after a matter has gone to arbitration, the procedures under § 1401(a)(3)(A) contemplate that the arbitrator will evaluate issues of insolvency under § 1405. Therefore, despite the absence of any specific statutory language requiring arbitration for § 1405, the numerous cross-references in the statute make evident that issues of insolvency under § 1405 are part of the calculus for determining withdrawal liability under § 1381 and § 1391 and, therefore, should be a subject for informal review under § 1399 and arbitration under § 1401.

644 F.Supp. at 748.

Other courts have likened section 1405 reductions to disputes about the amount of liability that should have been arbitrated. *See Central States, S.E. & S.W. Areas Pension Fund and Skyland Leasing Co.*, 691 F.Supp. 6, 14–15 (W.D.Mich.1987), *aff'd mem.*, 892 F.2d 1043 (6th Cir.1990) (any question of mitigation under 29 U.S.C. § 1405 must be arbitrated); *Central States, S.E. & S.W. Areas Pension Fund v. Johnco, Inc.*, 694 F.Supp. 478, 480–41

(N.D.Ill.1988) (because issues under section 1404 are part of the "calculus for determining withdrawal liability under Section 1381 and Section 1391, those issues should be arbitrated under Section 1401(a)") (citations omitted); *Trustees of Amalgamated Cotton Garment & Allied Indus. Fund v. Baltimore Sportswear*, 632 F.Supp. 641, 642 (S.D.N.Y.1986) (because an arbitrator would never be able to determine the total liability of an employer without considering the effect of section 1405, Congress probably intended section 1405 cases to be arbitrated, else "no arbitration would ever be able to go forward until after the resolution of a proceeding in the United States Courts").

Another court viewed a section 1405 determination as a factual issue which should be arbitrated. In *Skyland Leasing*, the court found:

> [T]hat the availability, via Sections 1405(b) and (d), of a decrease in the amount of liability assessed is a *factual dispute integrally related to the total amount of liability assessed by the Funds. This issue should have been timely presented at arbitration.* Having failed to timely arbitrate the amount of liability assessed or the manner of calculation, defendants may not challenge, at this late date, any part of the calculation, including relief which may have been available under Sections 1405(b) and (d).

691 F.Supp. at 15 (emphasis added). ERISA clearly requires section 1405 issues to be arbitrated. The Defendants, however, waived their right to seek review or arbitration by failing to initiate such actions within the statutorily prescribed nine-

---

**32.** As Plaintiffs noted in their brief, *Canario v. Byrnes* was settled while on appeal to the United States Court of Appeals for the Second Circuit. Pls.' Br. at 27 n. 13. The stipulation of settlement reads:

> IT IS HEREBY STIPULATED and agreed, by and between the undersigned attorneys, that in consideration of the settlement of this matter on appeal to the United States Court of Appeals for the Second Circuit, the Memorandum and Order of this Court, dated September 16, 1986, 644 F.Supp. 744, be, and the

same hereby is, withdrawn. All publishers which were given notice of said Memorandum and Order shall be given notice of this Order of Withdrawal and directed not to publish said Memorandum and Order, or, in the event it has already been published, to publish a notice of this Order of Withdrawal.

*Canario v. Byrnes*, 652 F.Supp. 385 (E.D.N.Y. 1987) (emphasis in original). The reasoning used by the *Canario* court, however, is persuasive and is cited as such.

ty-day period. By waiving their right to arbitration, the Defendants have also waived their right to reduce their liability under section 1405. For a court to bypass arbitration, "there must be a constitutional question, an issue of statutory construction, or no need to develop a factual record." *Progressive Supermarkets,* 644 F.Supp. at 749 (citing *Barker & Williamson,* 788 F.2d at 128–129). The Defendants raise no constitutional question and raise no genuine issue of material fact regarding their failure to seek arbitration in a timely manner. As a matter of law, the right of the Defendants to seek a reduction of liability is therefore waived.

■ Upon the failure of the Defendants to seek review or arbitration, the entire amount of liability, as determined by Plaintiffs' proposed schedule of payments, became due and owing.[33] 29 U.S.C. § 1401(a)(1), (b)(1). Pursuant to 29 U.S.C. § 1401(b)(1), courts have consistently held that failure to pursue timely arbitration under ERISA effectuates a waiver of the right to contest the existence and amount of withdrawal liability. *Barker & Williamson,* 788 F.2d at 129–30 (failure to seek review or arbitration in a timely fashion results in a waiver of statutory rights to contest and constitutes a default under 29 U.S.C. § 1399(c)(5));[34] *I.A.M. Nat'l Pension Fund v. Clinton Engines Corp.,* 825 F.2d 415, 416 (D.C.Cir.1987) (employer not entitled to dispute the existence and amount of withdrawal liability because it failed to initiate arbitration); *see also Teamsters Pension Trust Fund v. Laid-*

*law Indus.,* 745 F.Supp. 1016, 1026–27 (D.Del.1990); *Philadelphia Journal, Inc. v. Teamsters Pension Trust Fund of Philadelphia & Vicinity,* No. 87–7637, 1989 WL 45865, 1989 U.S.Dist. LEXIS 4727 (E.D.Pa. 2 May 1989); *Cardone Realty Corp. v. Teamsters Pension Fund of Philadelphia,* 99 B.R. 202, 205 (W.D.N.Y.1989); *In re Metro Transp. Co.,* 82 B.R. 351, 354 (Bankr.E.D.Pa.1988). Even if the Expert's Report presented by Defendants properly raises a question of fact regarding the proper amount of withdrawal liability, Expert's Report, ¶ 6, the opposition is untimely as a matter of law. *See* 29 U.S.C. § 1401(b).

### 2. *Whether the Defendants Have Failed to Prove Insolvency*

■ Assuming Defendants' failure to arbitrate was not a bar to reduction under section 1405, the reduction is still properly denied. The reduction of withdrawal liability allowed under section 1405 applies only in the case of an insolvent employer. 29 U.S.C. § 1405(b). For the reasons stated below, Defendants are not an "insolvent employer" within the meaning of 29 U.S.C. § 1405 and therefore are not entitled to a reduction of their joint and several liability.

Plaintiffs contend that the Defendants have not shown they are insolvent employers within the meaning of ERISA. The term "employers," Plaintiffs argue, includes Jayne's Motor Freight *and* members of the controlled group[35] who are held jointly and severally liable. According to

---

**33.** The relevant provisions of section 1401 provide:

(a)(1) Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration.

. . . .

(b)(1) *If no arbitration proceeding has been initiated* pursuant to subsection (a) of this section, the *amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor.* The plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection. 29 U.S.C. §§ 1401(a)(1), (b)(1) (emphasis added).

**34.** Section 1399(c)(5) provides in relevant part:

In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. 29 U.S.C. § 1399(c)(5).

**35.** Members of the controlled group jointly and severally liable for the withdrawal liability include Jayne's Motor Freight, the Partnership Defendants—Elizabethport and Bro-Jen—and of the Individual Defendants—Willard Jayne and Gary Jayne.

Plaintiffs, because only Jayne's Motor Freight is potentially insolvent and because the Defendants remain solvent, collectively as employers they are not insolvent.[36] Pls.' Br. at 27–28.

Defendants argue that this approach "strains common sense" as the "existence and identity of the controlled group often is unknown until long after the withdrawal liability calculation has been made." Defs.' Br. at 26. Plaintiffs' interpretation of the statute, according to the Defendants, would permit a pension plan to reassess withdrawal liability periodically as new members of a controlled group are discovered, or when the financial conditions of the controlled group members change. Defs.' Reply Br. at 26 and n. 28. As such, Defendants counter they should not be included as "employers" for the purposes of calculating the *amount* of withdrawal liability. Defs.' Reply Br. at 24–27. For the purposes of *assessing* withdrawal liability, however, the Defendants concede that they could be included, along with Jayne's Motor Freight, under the term "employer." Defs.' Reply Br. at 24–25.

At the heart of the dispute is an issue of statutory construction as to whether the term "insolvent employer" in 29 U.S.C. § 1405 refers to the *withdrawing employer* only (in this case, Jayne's Motor Freight) or all the controlled group members deemed to be the *single employer* (in this case, Jayne's Motor Freight *and* the Individual Defendants and Partnership Defendants). This appears to be an issue of first impression. The dispute also touches upon the larger question of the proper balance between policies underlying bankruptcy and pension law.

In construing the MPPAA, the *Sheldon Hall* court stated:

[I]t is a canon of statutory construction that a statute should be interpreted, wherever possible, to give effect to all of its component parts. . . . We must therefore look not merely to a particular clause, but to the statute as a whole, while simultaneously attempting to give effect to the MPPAA's purpose of protecting the assets of multi-employer pension plans.

862 F.2d at 1022 (citations omitted). Accordingly, in determining the proper construction of the term "insolvent employer," proper emphasis must be placed on the relation of section 1405 to other sections in the code and the overall purpose of the MPPAA.

Although insolvency is readily defined in 29 U.S.C. § 1405(d) the term "employer" is not defined anywhere in subchapter III of ERISA, 29 U.S.C. §§ 1301–1461, for its use within that subchapter. The word "employer," however, is defined in subchapter I of the statute. There, an "employer" is:

*any person* acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity.

29 U.S.C. § 1002(5) (emphasis added). "Person" is further defined as:

an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization.

*Id.*, § 1002(9).

If the definition in subchapter I were used, Plaintiffs' interpretation of section

---

**36.** The Plaintiffs argued:

ERISA provides that all members of the group of trades or businesses under common control are to be treated as a "single employer" for the purposes of assessing and collecting withdrawal liability. 29 U.S.C. § 1301(b)(1) (1990). In the instant case, that "employer" includes not only Jayne's Motor Freight, but also Elizabethport and Bro–Jen.

Elizabethport and Bro–Jen, together with the partners that (sic) control them, have substantial assets, including various real estate holdings. There is certainly no reason to believe that either partnership [or either Willard Jayne or Gary Jayne] is insolvent, or that there is any basis for reducing the partnerships' liability to the Fund. Thus, the "employer", as defined by ERISA, is not insolvent; on the contrary, only one member of the group or trades or businesses under common control is being liquidated in bankruptcy proceedings. Thus, Section 4225 [29 U.S.C. § 1405] is inapplicable, by its terms, to Defendants in this case.

Pls.' Br. at 28.

1405, that the term "insolvent employer" includes controlled group members, would prevail as the section 1002 definition of "employer" encompasses entities such as the Individual Defendants and Partnership Defendants. *See* 29 U.S.C. § 1002. The definitions found in subchapter I, however, are limited for use in that subchapter. *Id.* Section 1002 explicitly states that the definitions in that section are "[f]or purposes of this subchapter." *Id.* There is no statutory authority for using the definitions found in subchapter I for other subchapters. *See Connors v. P & M Coal Co.,* 801 F.2d 1373, 1376–77 (D.C.Cir.1986).

The legislative history does not provide further illumination on whether to construe "insolvent employer" to include controlled group members.[37] *See generally* 1980 Cong. & Admin.News 2918. Although generally referring to the policies underlying the need to provide special relief under section 1405, the legislative history discussing the rationale for section 1405 provides no specific direction on how to determine which entities should comprise the "insolvent employer." *Id.*

A wider review of policies underlying ERISA and other relevant law must be effected to decide the issue. Courts have generally recognized the MPPAA was enacted to ensure that pension funds were adequately funded. *See Sheldon Hall,* 862 F.2d at 1021; *Colteryahn Dairy,* 847 F.2d at 116; *Flying Tiger,* 830 F.2d at 1243; *Yahn & McDonnell,* 787 F.2d at 130. In enacting section 1405, however, Congress considered the competing concerns underlying bankruptcy law by limiting the liability imposed on employers found to be insolvent.[38] Section 1405 therefore forced ERISA law to converge with bankruptcy law. Litigation problems arise, however, when the two laws do not harmoniously intersect. As one commentator noted:

> Conflicts arise because ERISA policy encourages the accumulation of savings for retirement and the protection of accumulated retirement benefits, whereas the bankruptcy laws are motivated by the dual purposes of allowing the debtor a new financial beginning and permitting creditors to recoup from the debtor's existing assets as much of the monies owed to them as is possible. The sanctity and protection of retirement benefits cannot be maintained if those benefits can be attached by creditors. Conversely, the maximum amount of a debtor's assets is not made available to creditors if a sub-

---

**37.** The full text of the legislative history discussing the reductions for insolvent employers reads:

> As noted above, employer withdrawal liability is necessary to insure that employers that remain in the plan are not burdened with funding liabilities that should have been funded by the withdrawn employer. However, the Committees recognize that to balance the needs of these employers against those of the withdrawn employer. Accordingly, special relief rules are provided for (1) insolvency, (2) individual employers, and (3) asset sales. These relief provisions are applied to withdrawal liability determined after the application of (1) the deminimis rules, (2) any pro rate reduction of liability on account of a partial withdrawal, and (3) the 20–year payment cap.
>
> **b. Insolvency.**
> Under the bill, an insolvent employer undergoing a liquidation or dissolution, is always liable for an amount equal to 50 percent of his normal withdrawal liability. However, the employer's exposure for the next 50 percent of his normal withdrawal liability is limited to the employer's liquidation or dissolution value. This value is determined by tak-

ing the employer's value as of the beginning of the liquidation or dissolution, and reducing that value by an amount equal to the first 50 percent of the employer's normal withdrawal liability. To qualify for this rule, an insolvent employer need not undergo a formal liquidation or dissolution. It must, however, be insolvent and wind up its business affairs. The insolvency limitation applies in the aggregate to total withdrawal liability at the time of insolvency. Thus, where liabilities arise because of withdrawals from several plans, the 50–percent insolvency rule would be applicable to each such liability.

126 Cong.Rec. 20195 (29 July 1980).

**38.** The First Circuit noted:

> Congress evidently drafted the MPPAA with the Bankruptcy Code in mind, since § 4225(a) [29 U.S.C. § 1405] includes an express reference to Title 11. Thus, the MPPAA must be viewed as Congress' effort to balance the policies of the Bankruptcy Code with the goal of shoring up multiemployer pension plans....

*Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund,* 748 F.2d 42, 45 (1st Cir.1984).

stantial portion of those assets is in a retirement account that is unavailable to creditors.

Lawrence B. Wohl, "Pension and Bankruptcy Laws: A Clash of Social Policies," 64 N.C.L.Rev. 3, 5 (1985) (citations omitted).

The question of who should be included in the designation "insolvent employer" presents an example of an unharmonious intersection between bankruptcy and pension laws. At first glance, choosing whether to include or exclude the Defendants from the "insolvent employer" designation means having to choose between the policies underlying bankruptcy law or pension law, and favor one over the other. Including the Defendants' finances in the determination of insolvency would serve to defeat the application of a section 1405 reduction. The full amount of liability would therefore be due and owing to the Fund. As such, this approach serves to promote the MPPAA policies of ensuring adequate funding of pension plans. This is the position taken by the Plaintiffs. Pls.' Br. at 27–28.

Excluding the Defendants from the insolvency termination has the opposite effect. In this case, Jayne's Motor Freight would be deemed insolvent and the liability reduced under section 1405. The reduced withdrawal liability amount would mean that less is owed to the Fund, potentially creating the problem of underfunding to which pension laws were created to address. Protecting a party in a bankruptcy proceeding such as Jayne's Motor Freight, as the insolvent employer may, however, further bankruptcy policies.

Excluding the Defendants from the insolvency determination, however, leads to two possible results. One result is that advanced by the Defendants. They argue that the term "insolvent employer" includes only Jayne's Motor Freight. They argue, moreover, that determining the amount of withdrawal liability is a threshold issue and this issue must be decided before the "secondary issues regarding who must pay the liability" are decided. Defs.' Br. at 25 n. 26. Under this construction, Jayne's Motor Freight is the only employer whose insolvency is taken into account, the liability would be reduced, and the members of the controlled group would be liable only for the reduced amount. This approach may favor the bankruptcy policies but clearly frustrates ERISA policies by decreasing the amount of withdrawal liability pension plans would be able to collect.

Another approach, stemming from the exclusion of Defendants from the "insolvent employer" label, would favor both bankruptcy and pension law policies. In this approach, determining the amount of liability is *not* the threshold issue and determining who is liable is *not* the secondary issue. Rather, the process is reversed. Determining who is liable becomes the threshold issue and determining the amount of liability becomes the secondary issue. Accordingly, the liability of the Defendants and Jayne's Motor Freight would be determined first. After establishing joint and several liability, a court would then proceed to determining the amount of liability. If Jayne's Motor Freight is not entitled to a reduction, the entire withdrawal liability is due and owing by all members of the controlled group. If, however, Jayne's Motor Freight is entitled to a reduction as an insolvent employer, then Jayne's Motor Freight is liable only for the reduced amount while the other, solvent members of the controlled group would still be liable for the *entire* withdrawal liability not paid for by Jayne's Motor Freight.[39]

---

**39.** Plaintiffs apparently would approve of this approach. They comment in their brief:

To interpret ERISA as Defendants' suggest, allowing the entire control group to take advantage of the withdrawing employer's insolvency, would undermine the congressional intent behind the control group theory, which plainly contemplated the collection of withdrawal liability from solvent or more prosper-

ous trades or businesses affiliated through common ownership with the withdrawn employer.

Pls.' Reply Br. at 24–25.

Defendants, however, contend otherwise:

There is no dispute that members of the control group are derivatively liable to pay the employer's withdrawal liability. However, the Plaintiffs illogically extend this ba-

This approach also ensures that a debtor in bankruptcy, in this case Jayne's Motor Freight, is able to benefit from the protections Congress intended by enacting the Bankruptcy Code. At the same time, solvent members of the controlled group remain jointly and severally liable for the withdrawal liability, thus furthering the policies of the MPPAA.

This approach comports with decisions which similarly do not accord controlled group members relief from ERISA's mandate to arbitrate (or in this case, a mandate to pay the liability) merely because the withdrawing employer was undergoing bankruptcy proceedings. In *Slyman Indus.*, the Court of Appeals for the District of Columbia considered the argument of two solvent members of a controlled group that they should be allowed to seek review and arbitration even when the withdrawing employer failed to do so after proper notification of the liability. 901 F.2d at 129. The withdrawing employer failed to make withdrawal liability payments and filed a Chapter 11 bankruptcy claim. *Id.* The court concluded that the failure of the employer undergoing bankruptcy proceedings to seek arbitration precludes the solvent members of the controlled group from doing so later. *Id.* The court reasoned:

> [The withdrawing employer's] protection from suit pursuant to the Bankruptcy Code simply cannot affect the derivative legal liability of a nonbankrupt affiliate, any more than one joint tortfeasor would be protected because another is in bankruptcy proceedings.

*Id.* (quoting district court opinion); *accord Calvert*, 622 F.Supp. at 882 (holding solvent members of a controlled group could

not avoid arbitration requirement simply because withdrawing employer was undergoing bankruptcy); *Board of Trustees of W. Conference of Teamsters Pension Trust Fund v. Salt Creek Terminals, Inc.*, No. C85–2270R, 1986 WL 21503 (W.D.Wash. 6 February 1986) (refusing to let controlled group members dispute the merits of the withdrawal liability assessment because the issue was not arbitrated). As the Sixth Circuit reasoned:

> While the MPPAA can treat the two corporate entities as one for the calculation and assessment of liability, they are not a single employer for the purposes of the bankruptcy law and [the solvent controlled group members were] not a co-debtor with [the withdrawing employer] in its bankruptcy proceedings.

*Mason and Dixon Tank Lines, Inc. v. Central States, S.E. & S.W. Areas Pension Fund*, 852 F.2d 156, 163 (6th Cir. 1988).

Under principles of statutory construction "where the terms of a statute are unambiguous, judicial inquiry is complete." *Adams Fruit Co., Inc. v. Ramsford Barrett*, 494 U.S. 638, 110 S.Ct. 1384, 1387, 108 L.Ed.2d 585 (1990). Where ambiguity exists, however, it is the court's function to read statutes as being consistent with one another. *See generally Huber*, 916 F.2d at 97. The approach advanced here satisfies this mandate by construing section 1405 so that the policies of bankruptcy law and pension law are both advanced. To adopt the approaches advanced by Plaintiffs and Defendants would create an inconsistency in the law which should be "addressed to Congress, not the courts." [40]

Defs.' Reply Br. at 24–25 (emphasis added).

**40.** In opposition to the approach favored by Plaintiffs and presumably the approach adopted here, Defendants argue:

> The following hypothetical scenarios illustrate the irrationality of the Plaintiffs' theory.
>
> In one scenario, the Fund may not discover the existence of a solvent control group with a bankrupt employer until several years after the withdrawal liability assessment had been calculated, as was the case in *H.F. Johnson*, 830 F.2d 1009. Because no control group had been identified, the Fund properly reduced

sic, common-sense general rule to absurdity by theorizing that the control group's obligation to pay the employer's withdrawal liability somehow creates a new entity whereby the control group becomes the "employer".... [T]he control group's liability to pay withdrawal liability is [only] derivative.... In other words, an employer's withdrawal from a pension fund creates the liability. Section 1301(b) gives rise to other entities' obligation to pay that liability, but *the application of Section 1301(b) does not require a holding, sought by the Plaintiffs, that the control group is liable directly, and in its own right, to the pension plan.*

*Granada Wines,* 748 F.2d at 45. Accordingly, Defendants are not entitled to benefit from the reductions that may be applied to Jayne's Motor Freight under 29 U.S.C. § 1405.[41] Defendants remain jointly and severally liable for the entire withdrawal liability as assessed by the Fund even if Jayne's Motor Freight's share of the liability is reduced by 29 U.S.C. § 1405.

## I. Defendants' Opportunity to Conduct Discovery

■ A party opposing summary judgment must be given the opportunity to conduct discovery, to gather evidence and to develop its theories of recovery or defenses. *See generally Melo v. Hafer,* 912 F.2d 628, 633–34 (3d Cir.), *cert. granted,* — U.S. —, 111 S.Ct. 1070, 112 L.Ed.2d 1176 (1991); *Mid–South Grizzlies v. Nat'l Football League,* 720 F.2d 772, 779–81 (3d Cir.); *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1989). The Federal Rules of Civil Procedure provide:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

Defendants argue that Plaintiffs' motion for summary judgment should be denied because Defendants did not have an opportunity to conduct discovery. They contend that discovery is necessary to determine the amount of withdrawal liability and Plaintiffs' knowledge of the existence and identity of the alleged controlled group. Defs.' Br. at 34. Plaintiffs contend discovery was already allowed. Moreover, Plaintiffs argue that Defendants had already waived their right to contest the existence and amount of withdrawal liability by waiving their right to arbitration. Pls.' Br. at 21–22.

> the employer's withdrawal liability by operation of Section 1405(b). The Plaintiffs' theory would permit the Fund to recalculate the withdrawal liability several years after the initial calculation merely because it discovered that a solvent control group member existed at the time of withdrawal. Further, the Plaintiffs' theory would permit the Plaintiffs to obtain a summary judgment against the newly-discovered control group member *in the new amount of withdrawal liability,* because its time to contest its status as a control group member and the withdrawal liability in general expired when the first calculation was made. Such an absurd result should not be permitted.
>
> In another scenario, using the Plaintiffs' strained analysis, the Fund could assess withdrawal liability in an amount which is later determined to be excessive. Some time later, the Fund may discover the existence of a control group member, and seek a summary judgment against the newly-discovered entity *in the amount of the original assessment,* on the ground that the newly-discovered control group member failed to seek review of the original assessment within the statutory time period. The Defendants submit that this result, too, is absurd.

Defs.' Reply Br. at 26 n. 28 (emphasis in original text).

The scenarios envisioned by Defendants would occur only if withdrawal liability was always made contingent on the ability of those liable to pay for the liability. This is not the case. The process for calculating withdrawal liability is set out in 29 U.S.C. § 1391. None of the methods of computing withdrawal liability determines withdrawal liability based on the ability to pay. *See generally* 29 U.S.C. § 1391.

In certain limited circumstances, ERISA allows for the withdrawal liability to be reduced if an employer is undergoing insolvency or engaging in the sale of its assets. *See generally* 29 U.S.C. § 1405. The thrust of these limitations on withdrawal liability is based on congressional recognition of policies underlying bankruptcy law. Although bankruptcy laws are related to the ability to pay, the primary focus is on allowing a bankrupt entity to start afresh. *See* Wohl, *supra,* 64 N.C.L.Rev. at 5. The reductions allowed under ERISA, moreover, are just that: reductions from an amount of withdrawal liability assessed and determined *prior* to the reductions. The initial assessment is done independent of the ability to pay and independent of bankruptcy policies. Therefore, Defendants' fears as outlined in its hypothetical scenarios are unwarranted.

**41.** The application of section 1405 to *Jayne's Motor Freight* is not an issue here. Rather, at issue is the applicability of section 1405 to Defendants here as members of the control group. Whether Jayne's Motor Freight is entitled to a reduction is an issue before the Bankruptcy Court. Defs.' Br. at 25 n. 25.

■ While this case was before Judge Hutton, Defendants were given eleven months to conduct discovery. Scheduling Order; Pls.' Reply Br. at 30. Despite the Defendants' assertions to the contrary, an adequate opportunity to conduct discovery was provided. To properly contend that summary judgment should be delayed or denied pending further discovery, Defendants were required to submit an affidavit setting forth the "specific reasons why the moving party's affidavits in support of the motion for summary judgment cannot be responded to, and the facts are in possession of the moving party." [42] *Mid–South Grizzlies,* 720 F.2d at 779 (citing *Costlow v. United States,* 552 F.2d 560, 564 (3d Cir. 1977). Additionally, these reasons must be "genuine and convincing to the court rather than merely colorable." *Id.* (quoting *Robin Constr. Co. v. United States,* 345 F.2d 610, 614 (3d Cir.1965)).

Defendants have not submitted affidavits specifying the reasons why summary judgment should be denied. In response to Magistrate Judge Hedge's First and Second Discovery Orders requiring submission of an Expert's Report, Spadoro, Defendants' counsel, submitted an affidavit asserting that Plaintiffs have failed to produce certain documents required to be produced by the Second Discovery Order. Spadoro Aff., at 5–8. The Spadoro Affidavit fails to specify with the requisite specificity the reasons why the discovery sought should delay a decision of the summary judgment motion. Even if the Spadoro Affidavit and arguments made in Defendants' Brief were construed as such an affidavit, the discovery sought would fail to raise genuine issues of material fact sufficient to defeat Plaintiffs' summary judgment motion.

■ In their brief, Defendants assert that summary judgment should be denied because discovery is necessary on the following in order to properly determine the amount of withdrawal liability:

(a) which entities do the Plaintiffs allege to be in the control[led] group?

(b) which of those entities, if any, are solvent?

(c) what is the value of the assets of those entities?

(d) what is the liquidation value of the control[led] group as a whole?

Defs.' Br. at 38. Defendants, however, have waived their right to contest the existence and amount of withdrawal liability by failing to initiate review of arbitration proceedings within the statutorily prescribed time limits. *See Lafrenz,* 837 F.2d at 895; *H.F. Johnson,* 830 F.2d at 1013–15; *DeBolt Transfer,* 737 F.Supp. at 1443; *Petitte Bros.,* 1989 WL 3723; *Brady–Cline Coal Co.,* 668 F.Supp. at 9; *Tri–State Rubber,* 677 F.Supp. at 521; *Calvert,* 622 F.Supp. at 877. By failing to pursue review and arbitration in a timely manner, Defendants are prohibited from doing so now. 29 U.S.C. §§ 1401(a)(1), (b)(1); *see also Barker & Williamson,* 788 F.2d at 129; *Cardone Realty,* 99 B.R. at 205. As well, for the reasons previously stated, responses to these areas of inquiry are irrelevant.

Defendants rely on *I.A.M. National Pension Fund Benefit Plan A v. Allied Corporation,* 97 F.R.D. 34 (D.D.C.1983), for the proposition that even if an employer waives the right to arbitration, it does not waive the right to discovery to ensure that withdrawal liability existed and that the pension plan was entitled to the amount it sought to enforce. Defs.' Br. at 35 (citing *I.A.M. National Pension Fund,* 97 F.R.D. at 36). This holding, however, clearly conflicts with the plain dictates of ERISA. Section 1401(b)(1) provides:

(b)(1) If no arbitration proceeding has been initiated pursuant to subsection (a) of this section, *the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor.*

**42.** According to the *Mid–South Grizzlies* court:

Most courts which have considered the issue agree that filing an affidavit is necessary for the preservation of a Rule 56(f) contention that summary judgment should be delayed pending further discovery.

*Mid–South Grizzlies,* 720 F.2d at 780 n. 4 (citations omitted).

29 U.S.C. §§ 1401(a)(1), (b)(1). The wave of Third Circuit and other Circuit opinions deciding the issue comport with the plain reading of the statute. *See Barker & Williamson*, 788 F.2d at 129–30; *Clinton Engines Corp.*, 825 F.2d at 416; *Laidlaw Indus.*, 745 F.Supp. at 1021–26; *Philadelphia Journal*, 1989 WL 45865, 1989 U.S.Dist. LEXIS 4727; *Cardone Realty*, 99 B.R. at 205; *In re Metro Transp. Co.*, 82 B.R. at 351.

Finally, Defendants argue that discovery is necessary regarding the personal knowledge of the Trustees as to the existence and identity of members of the controlled group for the purposes of determining the sufficiency of notice. Defs.' Br. at 39. According to Defendants, this information is relevant to deciding whether Plaintiffs properly notified the Defendants whom they knew existed. *Id.* The need for discovery was considered at oral argument before Magistrate Judge Hedges on Defendants' motion to reopen discovery.[43] Magistrate Judge Hedges decided that no discovery was necessary on these issues before summary judgment can be decided. *See* Transcript of Proceedings, dated 30 July 1991.

■ Plaintiffs' knowledge of the existence and solvency of all or some of the controlled group members is irrelevant in deciding whether notice was properly given to the controlled group members. Notice to one member of a controlled group is notice to all. *See Barker & Williamson*, 788 F.2d at 127; *Sheldon Hall*, 862 F.2d at 1024; *Yahn & McDonnell*, 787 F.2d at 132 n. 3; *DeBolt Transfer*, 737 F.Supp. at 1442–43. As there is no dispute that notice was provided to at least one controlled group member, no genuine issue of material fact exists as to whether other members were constructively notified. *Id.*

J. Stay of Litigation Pending the Completion of the Bankruptcy Proceedings

Defendants have cross-motioned for a stay of litigation pending the completion of the bankruptcy proceedings. Trial courts in their discretion can determine whether to stay proceedings for a limited time, based on considerations such as the stage of litigation and possibility of settlement. *Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 584–85, 109 S.Ct. 1361, 1374–75, 103 L.Ed.2d 602 (1989); *see also Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426 (Fed.Cir.1988).

■ Several factors are involved in determining whether to stay this action pending the resolution of the bankruptcy proceedings against Jayne's Motor Freight. A court will examine whether two actions involve the same parties and whether the same issues are pending in either the same federal court or in different federal courts. *Home Ins. Co. v. Coastal Lumber Co.*, 575 F.Supp. 1081, 1083 (N.D.Ga.1983). Additionally, a court will consider whether plaintiffs will be prejudiced and whether the interests of judicial economy would be furthered by the stay. *See generally Nelson v. Grooms*, 307 F.2d 76, 78–79 (5th Cir.1962); *United States v. Key Oil Co., Inc.*, 460 F.Supp. 878, 879 (D.N.J.1978); *Robbins v. Pepsi-Cola Metro. Bottling Co.*, 637 F.Supp. 1014, 1019 (N.D.Ill.1986).

■ The balancing of interests in this case militates against granting a stay of litigation. The two proceedings—the bankruptcy proceeding and the present action for withdrawal liability payments—involve different parties. Jayne's Motor Freight is the only debtor involved in the bankruptcy proceeding. In the present action, Jayne's Motor Freight was specifically excluded from this suit and only Defendants are being sued for the withdrawal liability payments.

Under the Bankruptcy Code, 11 U.S.C. § 362(a), an automatic stay is awarded only to a party in bankruptcy proceedings. *See, e.g., Ingersoll-Rand Fin. Corp. v. Miller*

---

**43.** At a hearing held 30 July 1991, Defendants argued that Plaintiffs' knowledge of the identity of potential defendants was necessary to adjudicate the notice issue. Magistrate Judge Hedges observed that discovery of Plaintiffs' knowledge was "irrelevant" because ERISA's constructive knowledge provisions did not require inquiry into Plaintiffs' knowledge of all defendants' identities. Transcription of Proceedings held 30 July 1991 at 8–12.

*Mining Co.*, 817 F.2d 1424, 1427 (9th Cir. 1987) ("In the absence of special circumstances, stays pursuant to section 362(a) [of Title Eleven of the Bankruptcy Code] are limited to debtors and do not include non-bankruptcy co-defendants."); *Teachers Ins. and Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir.1986) (stay in bankruptcy applies only to debtor partner and not to individual general partner defendants who have not declared bankruptcy); *Otoe County Nat'l Bank v. W & P Trucking, Inc.*, 754 F.2d 881, 883 (10th Cir.1985) (automatic stay does not extend to guarantor of debtor under section 362).

The automatic stay awarded to the withdrawing employer also does not extend to other members of a controlled group. *Cardone Realty*, 99 B.R. at 205. The *Cardone Realty* case, as here, dealt with a realty company which leased property to a motor freight company. Both companies were held to be in common control. The motor freight company in *Cardone Realty* filed for bankruptcy and was awarded an automatic stay. The *Cardone Realty* court held that the automatic stay provision did not apply to the realty company. 99 B.R. at 205.

Different issues are also at stake. The issues pending before the bankruptcy court involve the amount of liability to be assessed against Jayne's Motor Freight. In this case, Defendants have waived their right to contest the existence or amount liability by failing to arbitrate within the statutorily prescribed time periods. Moreover, the issues in this case primarily involve whether Defendants are jointly and severally liable for the withdrawal liability of Jayne's Motor Freight. The bankruptcy court has no jurisdiction to impose such liability on Defendants.

Finally, Plaintiffs would be prejudiced by a stay of this litigation. As Plaintiffs noted, it has been almost four years since Jayne's Motor Freight withdrew from the Fund. The Fund has been obligated to pay the pensions of those employees who worked for Jayne's Motor Freight. Jayne's Motor Freight, however, has not made any interim withdrawal liability payments, as required by ERISA. Satisfaction of the withdrawal liability claim will most likely be obtained from Defendants, and not from any distribution of funds from the estate of Jayne's Motor Freight. A stay of the present litigation will unduly prejudice Plaintiffs.

### K. Equitable Tolling

██ Defendants argue that the time within which they have to seek review of the claim or initiate arbitration or to do both should be tolled as Defendants have timely pursued nonfrivolous litigation regarding the withdrawal liability assessment. In support of their argument, they cite *Trustees of the Chicago Truck Drivers v. Central Transp., Inc.*, 888 F.2d 1161, 1164 (7th Cir.1989). In *Central Transp.*, the court held that equitable tolling applied where a party "properly pursued a *viable* claim contesting the application of withdrawal liability in a judicial forum." *Central Transp.*, 888 F.2d at 1164 (emphasis added). Defendants also argue that the equitable tolling doctrine should apply here where they were unaware of the claim, but upon learning of the claim, acted "decisively and vigilantly to protect their rights." Defs.' Reply Br. at 19.

The equitable tolling doctrine, however, was developed to address situations where a party's action amounted to "an affirmative inducement to [an opposing party] to delay bringing an action." *Connors v. Beth Energy Mines, Inc.*, 920 F.2d 205, 211 (3d Cir.1990) (quoting *Ciccarelli v. Carey Canadian Mines, Ltd.*, 757 F.2d 548, 556 (3d Cir.1985)); *see also Bowers v. Transp. Maritima Mexicana, S.A.*, 901 F.2d 258, 264 (2d Cir.1990). Defendants have failed to allege any such fraudulent inducement on behalf of Plaintiffs. Moreover, Defendants' citation to *Central Transp.* is not in point. The *Central Transp.* court noted that the equitable tolling doctrine is a "narrow" doctrine and applies only where the party asserting the doctrine was pursuing a "viable" claim in a judicial forum. *Central Transp.*, 888 F.2d at 1164. Defendants have not shown that any of their alleged actions constituted viable claims.

The doctrine of equitable tolling was not intended to have wide-ranging uses. Thus, equitable tolling:

> is not a general term of reference for any one of a variety of situations in which limitations periods are relaxed. Rather, it is an uncomplicated, but rather limited doctrine, which tolls the statute of limitations with regard to federally created causes of action ... which have been fraudulently concealed, until the fraud or concealment is, or in the exercise of reasonable diligence should have been, discovered.

*Bowers,* 901 F.2d at 264 (*quoting from Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 553 n. 26 (S.D.N.Y.1977)).

■ In the present case, Defendants do not assert that Plaintiffs engaged in any fraudulent tactics to conceal the existence of a claim. Not being aware of a claim alone is insufficient for the doctrine of equitable tolling to apply:

> In absence of fraud or unfair conduct by the Fund, and in the absence of any affirmative action on the part of TMM to preserve its right to arbitration, we find no inequitable circumstances warranting a judicial extension of the time limitation under the doctrine of equitable tolling. *See Miller [v. International Tel. & Tel. Corp.],* 755 F.2d [20] 24 (2d Cir.1985) *Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1055 (2d Cir.1969) (Friendly, J.). *See generally* 54 C.J.S. *Limitations of Actions* § 86 (1987) (equitable tolling available when party "was in some extraordinary way prevented from asserting his rights").

*Bowers,* 901 F.2d at 264.

Additionally, Defendants have done little to preserve their rights to ERISA's mandatory review and arbitration proceedings. They were aware of the potential withdrawal liability long before the filing of the present action. Defendants have admitted that they were aware of the withdrawal liability as late as 8 March 1990. The present suit was not filed until 27 June 1990—approximately twenty days after the ninety-day statutory time period to request review or arbitration had elapsed.

■ Parties seeking equity must do equity. *Koster v. (American) Lumbermans Mut. Caus. Co.,* 330 U.S. 518, 522, 67 S.Ct. 828, 830–31, 91 L.Ed. 1067 (1947). Defendants' inaction bars them from reaping the rewards of the equitable tolling doctrine. Their failure to make payments in accordance with the schedule set forth by the Fund pending resolution of the dispute, as required by ERISA, also bars them from equitable relief. 29 U.S.C. § 1399(b)(1); *see also Bowers,* 901 F.2d at 264.

■ Defendants also argue that the time period for initiating arbitration should be tolled because the Fund filed a proof of claim in Bankruptcy Court against Jayne's Motor Freight. To support this argument, they rely upon *Central Transp.,* 888 F.2d at 1165 ("the filing in the bankruptcy court by the Fund, accompanied by a timely response by the defendants, tolled the time period for seeking arbitration under section 1401(a)(1)"). Defs.' Br. at 17–19. The equitable tolling option, however, is available only to the debtor in bankruptcy, in this case, Jayne's Motor Freight. The tolling is not applicable to solvent members of a controlled group not involved as a party in the bankruptcy proceeding. *Slyman Ind.,* 901 F.2d at 129. Plaintiffs in the present case seek withdrawal liability from Individual Defendants in their capacity as partners of the Partnership Defendants, Elizabethport and Bro–Jen, and from the Partnership Defendants. The Individual Defendants make no arguments that the actions taken by Jayne's Motor Freight in bankruptcy proceedings can be imputed to them as actions taken to contest the claim. The Individual Defendants therefore provide no cognizable excuse justifying their failure to initiate review or arbitration proceedings in their individual capacities or as partners of Elizabethport and Bro–Jen. Consequently, they are precluded from contesting the existence and amount of withdrawal liability. *See Calvert,* 622 F.Supp. at 881–82; *Salt Creek Terminals, Inc.,* 1986 WL 21503; *McDonald v. Centra,* 118 B.R. 903, 917–19 (Bankr.D.Md.1990).

Different choices exist for those subject to withdrawal liability. As discussed above, a withdrawing employer undergoing bankruptcy proceedings has the potential of asserting the equitable tolling doctrine to extend the time available to seek review and arbitration. Members of a controlled group who are not parties to the bankruptcy proceeding have different options available to them when faced with withdrawal liability: (1) admit controlled group status and arbitrate; (2) compel the corporate sibling/withdrawn employer to arbitrate; (3) bring an appropriate declaratory judgment action while making interim payments; or (4) do nothing. *Barker & Williamson,* 788 F.2d at 129. Members of a controlled group who fail to act risk losing their review and arbitration options and risk default. *Id.* Defendants in the present case fall into the last category of options. By failing to act, they have waived their rights to seek review and arbitration.

### L. Additional Damages

In addition to the withdrawal liability, Plaintiffs seek additional damages in the amount of interest, liquidated damages and attorneys' fees for Defendants' failure to make payments on the withdrawal liability.

■ Under ERISA, an employer's failure to make timely payments in actions to compel payments of withdrawal liability are treated in the same manner as delinquent contributions within the meaning of 29 U.S.C. § 1145. The relevant cost provisions for actions under section 1145 are found in 29 U.S.C. § 1132(g)(2). Section 1132(g)(2) provides in part:

> (2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—
>
> (A) the unpaid contributions,
>
> (B) interest on the unpaid contributions,
>
> (C) an amount equal to the *greater* of—
>
> (i) interest on the unpaid contributions, or

> (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A). (D) reasonable attorney's fees and costs of the action, to be paid by the defendants....

29 U.S.C. § 1132(g)(2) (emphasis added). *See also Sheet Metal Workers Local 19 v. Keystone Heating,* 934 F.2d 35, 38–39 (3d Cir.1991); *Penn Elastic Co. v. United Retail & Wholesale Employees Union,* 792 F.2d 45, 47 (3d Cir.1986).

The Third Circuit has held that in withdrawal liability actions, pursuant to 29 U.S.C. § 1132(g)(2)(C), the court should apply the interest rate prescribed by the terms of the pension plan. *Sheldon Hall,* 862 F.2d at 1023, *cert. denied,* 490 U.S. 1082, 109 S.Ct. 2104, 104 L.Ed.2d 665 (1989). The court should then award an additional amount equal to the greater of the interest on the withdrawal liability or liquidated damages provided for under the plan. *Id.*

■ The Plan provides that in the event of a default on withdrawal liability payments, interest will be charged at a "rate based on prevailing market rates for comparable obligations determined by the Board of Trustees in accordance with regulations prescribed by the Pension Benefit Guaranty Corporation." Section 11.12(c) of the Plan. The Plan also provides for a twenty percent liquidated damages fee. Section 11.12(a) of the Plan. Accordingly, Plaintiffs are directed to submit proper documentation regarding the interest rate prescribed by the PBGC. Pursuant to section 1132(g)(2), Plaintiffs are awarded the greater of the interest rate prescribed by the PBGC on the withdrawal liability or the twenty percent liquidated damages fee. 29 U.S.C. § 1132(g)(2)(C). This amount is awarded in addition to the interest rate prescribed pursuant to 29 U.S.C. § 1132(g)(2)(B).

■ Section 1132(g)(2)(D) also provides for the award of reasonable attorney's fees

and costs of the action. *Id.,* § 1132(g)(2)(D). Award of either liquidated damages or interest and reasonable attorney's fees is mandatory, not discretionary. *Sheldon Hall,* 862 F.2d at 1023 (citing *Penn Elastic Co.,* 792 F.2d at 47; *Yahn & McDonnell,* 787 F.2d at 134. The award of mandatory attorney's fees in Third Circuit opinions comports with the approach other circuits have taken. *See, e.g., Operating Eng'rs Pension Trust v. Reed,* 726 F.2d 513, 514 (9th Cir.1984); *O'Hare v. General Marine Transp. Corp.,* 740 F.2d 160, 171 (2d Cir.), *cert. denied,* 469 U.S. 1212, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985); *Carpenters Amended and Restated Health Benefit Fund v. John W. Ryan Constr. Co., Inc.,* 767 F.2d 1170, 1175–76 (5th Cir.1985).

■ Plaintiffs are therefore awarded attorney's fees pursuant to section 1132(g)(2)(D). 29 U.S.C. § 1132(g)(2)(D). As Plaintiffs have not submitted affidavits concerning the amount of time they have spent on this litigation and a proposed hourly rate, Plaintiffs are ordered to submit such information.

*Conclusion*

For the reasons discussed above, Plaintiffs' motion for summary judgment as against Willard Jayne, Gary Jayne, Elizabethport and Bro–Jen is granted. Defendants' cross-motion for summary judgment and stay of litigation is denied. Plaintiffs are awarded the amount of the withdrawal liability, interest on the withdrawal liability, attorneys' fees and the greater of the liquidated damages fee or interest on the unpaid contributions as indicated above.